STATE OF CONNECTICUT *v.* SUSHIL GUPTA
(SC 18122)

Rogers, C. J., and Katz, Palmer, Vertefeuille, Zarella, McLachlan and Robinson, Js.*

---

* The listing of justices reflects their seniority status on this court as of the date of oral argument.

Argued October 19, 2009—officially released June 29, 2010

*Michele C. Lukban*, senior assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Stacey M. Haupt*, assistant state's attorney, for the appellant (state).

*Hugh F. Keefe*, with whom, on the brief, was *Tara L. Knight*, for the appellee (defendant).

*Opinion*

KATZ, J. After a jury trial in three consolidated cases, the defendant, Sushil Gupta, was convicted in two cases of sexual assault in the fourth degree in violation of General Statutes § 53a-73a (a) (5),[1] sexual contact by means of a false representation by a health care professional that the sexual contact is for a bona fide medical purpose. The defendant appealed from the trial court's judgments of conviction to the Appellate Court, which reversed the judgments on the ground that the trial court had abused its discretion in consolidating the cases for trial and excluding certain medical treatises and instructional videotapes from evidence. See *State v. Gupta*, 105 Conn. App. 237, 256, 937 A.2d 746 (2008). We then granted the state's petition for certification to appeal, limited to the following issues: (1) "Did the Appellate Court properly conclude that the trial court abused its discretion in consolidating the three cases against the defendant?"; (2) "Did the Appellate Court properly determine that the trial court improperly failed to admit certain medical treatises and videotapes?"; and (3) "Did the Appellate Court properly conclude that

---

[1] General Statutes § 53a-73a (a) provides in relevant part: "A person is guilty of sexual assault in the fourth degree when . . . (5) such person subjects another person to sexual contact and accomplishes the sexual contact by means of false representation that the sexual contact is for a bona fide medical purpose by a health care professional . . . ."

Although § 53a-73a (a) has been amended since the time of the offenses in the three underlying cases, the relevant provisions under which the defendant was charged were not affected. Accordingly, for purposes of convenience, we refer to the current revision of the statute.

General Statutes § 53a-65 (3) defines " '[s]exual contact' " as "any contact with the intimate parts of a person not married to the actor for the purpose of sexual gratification of the actor or for the purpose of degrading or humiliating such person or any contact of the intimate parts of the actor with a person not married to the actor for the purpose of sexual gratification of the actor or for the purpose of degrading or humiliating such person."

the defendant's conviction for the sexual assault of M[2] required reversal even though it was the 'most brutal and shocking' of the three assaults that were consolidated for trial?" *State* v. *Gupta*, 286 Conn. 907, 944 A.2d 980 (2008). We answer the first question, which is dispositive of this appeal, in the affirmative. We also reach the second question, and conclude that the Appellate Court's conclusion was improper with respect to the treatises, but proper with respect to exclusion of the videotapes. We therefore affirm in part the judgment of the Appellate Court.

The Appellate Court opinion sets forth the following facts that the jury reasonably could have found. "The defendant is a physician with a specialization in pulmonology. At the times relevant to this appeal, the defendant was affiliated with a group practice, the Cardiothoracic and Vascular Group (medical group). . . .

"On August 29, 2003, J was a college freshman. That morning, her father took her to her appointment with the defendant because she appeared to have a sinus infection and was suffering from allergies and asthma. Because J had had sinus infections in the past, she had seen the defendant once or twice previously. When the defendant entered the examining room, J revealed her symptoms to him. She also added that she was menstruating because some of the symptoms she was experiencing were common to both her sinus problems and menstruation. The defendant asked J if her breasts were tender while she was menstruating, and, as he asked her, he cupped his hands against his chest. The defendant then felt J's sinuses, looked in her ears, nose and throat and felt the glands in her neck. J then removed

[2] In accordance with our policy of protecting the privacy interests of the victims of sexual abuse, we decline to identify the victims or others through whom the victims' identities may be ascertained. See General Statutes § 54-86e.

her sweatshirt, and the defendant lifted the back of her tank top and placed a stethoscope on her back to listen to her lungs.

"When the defendant examined J's chest, he partially rolled up the front of J's tank top, exposing the lower half of her breasts. Surprised by this, J moved back and asked the defendant if he wanted her to roll up her tank top. The defendant nodded yes, and J rolled up the rest of her tank top. At this point, J was leaning back with her arms behind her on the examination table. First, the defendant touched J's left breast with his two fingers. Then the defendant placed both of his palms on her breasts simultaneously, and he began kneading or massaging her breasts, running his thumbs over the top of her nipples. While massaging J's breasts, the defendant made a grumbling or a low moaning sound. The defendant had not performed this type of breast examination during J's previous visits for sinus infections. After checking her abdomen, the defendant completed the examination and prescribed medications for her sinus infection. The defendant also recommended a follow-up appointment, which J made that day but cancelled shortly thereafter.

"After the examination, J did not tell her father about what had happened during her examination because she was not comfortable talking to him about it. J went home, however, and discussed the examination with her mother. J told her mother that she had a suspicion that she had been sexually assaulted. . . .

"On November 7, 2003, D was twenty-two years old. On that day, D saw the defendant because her primary care physician had referred her to him after an X ray had revealed spots on her lungs. When D entered the examination room, a nurse asked her to remove her shirt but to keep her bra on and gave her a gown to put on. When the defendant came in, he felt D's glands

and listened to her lungs with a stethoscope. He then asked her to unhook her bra and to lie down on the examination table. The defendant first used two fingers to feel D's breasts, but then he felt both breasts, one at a time, with his full hand. He did this twice to each breast. After completing the examination, the defendant told D that he was very worried about her condition and that she should make another appointment for five days later.

"On November 12, 2003, D returned for her second appointment. After D took a pulmonary functions test, the defendant examined her. The defendant asked D to unhook her bra, and then she lay down on the table. He then repeated the same procedure he had done during her first examination. He first used two fingers to feel around her breasts and then felt first one breast and then the other breast with his full hand. He did this twice with each breast. At the end of the examination, the defendant made a comment to D about how she was physically fit. After that appointment, D scheduled one more appointment for three weeks later. D was uncomfortable at the previous visit, but she returned regardless in an attempt to cure her illness. At this third appointment, the defendant performed the same examination he had performed during the two previous appointments. The defendant recommended that D schedule another appointment with him in March, 2004. Although she scheduled the appointment, she did not keep it. . . .

"In March, 2004, M was employed as a medical assistant by the medical group. She had been employed by the medical group for four years. M mainly worked in one office, but on March 26, 2004, M was filling in for the defendant's medical assistant in another office. Prior to this date, M had approached the defendant about her having an examination with him. She was concerned because her father had told her that her

mother and her grandfather had had tuberculosis and that she had tested positive for it as a baby. As a result, the defendant suggested that she have a chest X ray, and she complied with the recommendation. The defendant subsequently looked at the X ray, which he determined was normal. Nevertheless, he told her that she should still have an examination. The defendant then approached her three times about her having an examination with him.

"On March 26, 2004, the defendant examined M. He directed her to an examination room where she sat down on the examination table. The defendant closed the door behind them and then closed the window blinds. At that point, the defendant approached M, grabbed her face, kissed both sides of her cheeks and thanked her for coming in to help him that day. He then examined her by checking the glands in her neck and looking into her mouth. Next, he used a stethoscope on her back to listen to her breathing. As he was doing that, he asked her if he could remove her laboratory coat and then went under her shirt to listen to her breathing. He then asked if he could undo her bra and proceeded to do so. He listened to her chest and then went under her shirt in the front and listened to her chest again. When he was finished, M pulled her shirt down. The defendant then asked M to lie down on the examination table. She lay down on the table, and he pulled her top up quickly, taking the bra with it and fully exposing her breasts. The defendant told M that he was going to check for lumps. He began to feel her breasts with his fingertips, but then he firmly grabbed both of her breasts with his hands and started to massage them. As he massaged her breasts, the defendant remarked to M that her breasts were soft and beautiful. Next, the defendant tapped M's stomach and remarked that her stomach was flat. With one hand, the defendant pulled back the bottom of her pants, taking the under-

wear with it and exposing the top of her 'private area.' As he was tapping her pelvic bone, he commented that she was shaved and told her that she was 'so hot.' At that point, M asked the defendant if they were finished, and the defendant said it would only be a few more minutes.

"The defendant then again firmly massaged M's breasts with both of his hands. The defendant asked if he could kiss her breasts. Although M replied 'no,' the defendant proceeded to put his mouth on each breast and to suck on them briefly. He also pinched her nipples. At that point, M jumped up from the table, pulled down her shirt and said, 'No, we are done. That is enough.' The defendant then came up from behind M, put his hands underneath her shirt and grabbed her breasts, asking to feel her while she was sitting up. In response, M firmly took the defendant's hands, pulled them down and stated, 'No, we are done.' The defendant then told M she was fine and did not prescribe any medication for her.

"M walked out of the examination room, and the defendant followed her, asking if they could have lunch sometime. M responded 'sure,' and the defendant asked if she would have lunch at the office that day. She tried to tell him that she had to get back to the other office, but he was persistent in asking her until she agreed to stay. M stayed for a few minutes before deciding to leave. Before M left, the defendant grabbed her face and kissed both sides of her cheeks. He then attempted to kiss her on the lips, but she turned her head, so he bit at her cheek in a sexual manner.

"M reported the incident to her fiancé later that evening. They decided, first, to call a rape victims' hotline. Thereafter, M went to the police and gave a statement accusing the defendant of sexually assaulting her. As a result of the assault, M did not return to work at

the medical group." *State* v. *Gupta*, supra, 105 Conn. App. 241–46.

The defendant was arrested and charged with sexual assault in the fourth degree in violation of § 53a-73a (a) (5) and sexual assault in the fourth degree in violation of § 53a-73a (a) (2)[3] in connection with his conduct toward M. After an article about the defendant's arrest appeared in the newspaper, J reported to the police that the defendant also had assaulted her. Shortly thereafter, D saw another newspaper article about the defendant's arrest and reported the defendant's conduct with her to the police. The defendant was then charged in separate informations with sexual assault in the fourth degree in violation of § 53a-73a (a) (2) and (5) in connection with his conduct with J and D.

Before trial, the state filed a motion to consolidate the three cases for trial claiming that the evidence would be cross admissible, and the defendant filed a motion to sever the cases claiming that he would suffer undue prejudice if the cases were consolidated. After hearing argument on the motions, the trial court granted the state's motion to consolidate the cases and denied the defendant's motion to sever.

At trial, the state filed a motion in limine to preclude the defendant from introducing as evidence two instructional videotapes explaining the proper technique for performing a physical examination. After viewing the videotapes, the trial court granted the motion on the ground that the videotapes were irrelevant and possibly misleading. Thereafter, the defendant attempted to introduce several excerpts from medical treatises on

---

[3] General Statutes § 53a-73a (a) provides in relevant part: "A person is guilty of sexual assault in the fourth degree when . . . (2) such person subjects another person to sexual contact without such other person's consent . . . ."

See footnote 1 of this opinion for a discussion of the relevant statutory revision.

the ground that they corroborated the opinion of his expert witness, Francoise Roux, a pulmonologist, that the defendant had performed a proper pulmonary examination on the three victims. The state objected to the evidence, and the trial court sustained the objection on the ground that the excerpts were irrelevant and potentially confusing. The court, however, allowed counsel for the defendant to read aloud whatever portions of the excerpts he deemed probative during his examination of Roux and to question her about them. Roux agreed that the excerpts supported her testimony and demonstrations as to the proper examination technique.

The jury found the defendant guilty of two counts of sexual assault in the fourth degree in violation of § 53a-73a (a) (5) with respect to the charges involving M and J and not guilty on a third count with respect to the charges involving D. The defendant then appealed from the judgments of conviction to the Appellate Court claiming that the trial court had abused its discretion in consolidating the cases for trial; see id., 246; and that the trial court had abused its discretion and deprived the defendant of his constitutional right to present a complete defense when it excluded the videotapes and excerpts from the treatises.[4] Id., 250. The majority of the Appellate Court agreed with both of the defendant's claims and, accordingly, reversed the defendant's convictions and ordered new trials in the cases involving J and M. Id., 256. In a concurring opinion, Judge Lavine determined that the trial court's consolidation of the cases was not improper, but agreed with the majority that the trial court improperly had excluded the evidence. Id., 256–58.

---

[4] In his brief to this court, the defendant makes no claim that the exclusion of the evidence had constitutional ramifications. Accordingly, we deem any such claim abandoned. See *State* v. *Clark*, 255 Conn. 268, 281 n.30, 764 A.2d 1251 (2001).

On appeal to this court, the state claims that the Appellate Court improperly concluded that the trial court had abused its discretion in: (1) consolidating the three cases for trial; and (2) excluding the videotapes and treatise excerpts. We disagree with the state's first claim and agree in part with its second claim and, therefore, we affirm in part and reverse in part the judgment of the Appellate Court.

I

We first address the state's claim that the Appellate Court improperly determined that the trial court had abused its discretion in consolidating the three cases. We conclude that the evidence in M's case was not cross admissible in the other two cases under the rule allowing evidence of other misconduct in cases involving sex crimes, that the denial of severance resulted in substantial injustice and that any resulting prejudice was beyond the curative power of the court's instructions. Accordingly, the Appellate Court properly determined that the trial court should not have consolidated M's case with the other two cases.

We begin with the law governing the consolidation of similar charges in pending cases against the same defendant. "General Statutes § 54-57[5] and Practice Book § 41-19[6] permit a trial court to join similar charges in pending cases against a common defendant. Our prior decisions have made clear that the trial court enjoys broad discretion in this respect and that its decision to consolidate will not be disturbed in the absence of

[5] General Statutes § 54-57 provides: "Whenever two or more cases are pending at the same time against the same party in the same court for offenses of the same character, counts for such offenses may be joined in one information unless the court orders otherwise."

[6] Practice Book § 41-19 provides: "The judicial authority may, upon its own motion or the motion of any party, order that two or more informations, whether against the same defendant or different defendants, be tried together."

manifest abuse of that discretion. *State* v. *McKenzie-Adams*, 281 Conn. 486, 519–20, 915 A.2d 822, cert. denied, 552 U.S. 888, 128 S. Ct. 248, 169 L. Ed. 2d 148 (2007). [T]his court consistently has recognized a clear presumption in favor of joinder and against severance . . . and, therefore, absent an abuse of discretion . . . will not second guess the considered judgment of the trial court as to the joinder or severance of two or more charges. . . . Id., 521. On appeal, [t]he defendant bears a heavy burden of showing that the denial of severance resulted in substantial injustice, and that any resulting prejudice was beyond the curative power of the court's instructions. . . . Id., 520.

"[When] evidence of one incident can be admitted at the trial of the other, separate trials would provide [a] defendant no significant benefit. It is clear that, under such circumstances, [a] defendant would not ordinarily be substantially prejudiced by joinder of the offenses for a single trial. *State* v. *Pollitt*, 205 Conn. 61, 68, 530 A.2d 155 (1987). We consistently have found joinder to be proper if we have concluded that the evidence of other crimes or uncharged misconduct would have been cross admissible at separate trials. *State* v. *McKenzie-Adams*, supra, 281 Conn. 520 (citing cases); see also *State* v. *Atkinson*, 235 Conn. 748, 765, 670 A.2d 276 (1996) (concluding that consolidation was proper, in part, because evidence of escape offense would have been admissible at trial to prove consciousness of guilt of other factually unrelated offenses); *State* v. *Greene*, 209 Conn. 458, 464, 551 A.2d 1231 (1988) ([t]he trial court properly joined the two cases for trial because, in the event of separate trials, evidence relating to each of the cases would have been admissible in the other); *State* v. *Pollitt*, supra, 72." (Internal quotation marks omitted.) *State* v. *Johnson*, 289 Conn. 437, 451–52, 958 A.2d 713 (2008).

With these principles in mind, we next turn to the law governing the admissibility of propensity evidence. "We recently have adopted an exception to § 4-5 (a) of the Connecticut Code of Evidence . . . allowing the admission of prior misconduct evidence to establish propensity in sex related cases if certain conditions are met. See *State* v. *DeJesus*, [288 Conn. 418, 470–74, 953 A.2d 45 (2008)]. Specifically, we concluded in *DeJesus* that evidence of uncharged sexual misconduct is admissible only if it is relevant to prove that [a] defendant had a propensity or a tendency to engage in the type of aberrant and compulsive criminal sexual behavior with which he or she [was] charged. Relevancy is established by satisfying the liberal standard pursuant to which [prior sex crimes] evidence previously was admitted under the common scheme or plan exception. Accordingly, evidence of uncharged misconduct [or other crimes] is relevant to prove that [a] defendant had a propensity or a tendency to engage in the crime charged only if it is: (1) . . . not too remote in time; (2) . . . similar to the offense charged; and (3) . . . committed [against] persons similar to the prosecuting witness. . . .

"[Such] [e]vidence . . . is admissible only if its probative value outweighs the prejudicial effect that invariably flows from its admission. . . . In balancing the probative value of such evidence against its prejudicial effect, however, trial courts must be mindful of the purpose for which the evidence is to be admitted, namely, to permit the jury to consider a defendant's prior bad acts in the area of sexual abuse or child molestation for the purpose of showing propensity." (Internal quotation marks omitted.) *State* v. *Johnson*, supra, 289 Conn. 452–53.

In the present case, the state argues that the trial court properly consolidated the cases involving D, J and M because, under *DeJesus*, the evidence in all three

cases would have been cross admissible as propensity evidence. The state dismisses the reliance by the defendant and the Appellate Court on this court's holding in *State* v. *Ellis*, 270 Conn. 337, 852 A.2d 672 (2004), contending that the facts in that case are distinguishable from those in the present case.[7] We disagree with the state and consider the Appellate Court's assessment of the present case to be accurate and persuasive.

Although we concluded in *DeJesus* that evidence of uncharged sexual misconduct is admissible to prove that a defendant had a propensity or a tendency to engage in aberrant and compulsive criminal sexual behavior; *State* v. *DeJesus*, supra, 288 Conn. 422; we also underscored that this approach does not divest trial courts of their gatekeeping function and thereby allow the state to introduce *any* prior sexual misconduct evidence against an accused in sex crime cases. Id., 472–74; see id., 472 (cautioning that "our approach does not vest trial courts with carte blanche to allow the state to introduce any prior sexual misconduct evidence against an accused in sex crime cases" [internal quotation marks omitted]). Instead, as the previous discussion of *DeJesus* clearly explains, the trial court must

[7] The decisions of both the trial court and the Appellate Court in the present case preceded our decision in *DeJesus*, in which we finally conceded that our liberal admission of prior sexual misconduct under the common plan or scheme exception to the bar against the use of propensity evidence was in fact a rule permitting such evidence to be used for propensity purposes. *State* v. *DeJesus*, supra, 288 Conn. 473–74. Therefore, the underlying decisions in the present case rested on the cross admissibility of the evidence under the liberal common plan or scheme exception, not the propensity exception. As *DeJesus* makes clear, however, although we changed the label of the exception, we did not change the parameters that such evidence must satisfy to be admissible. See id., 473 (citing court's earlier sexual misconduct cases admitting evidence under common scheme exception as setting forth limits under which propensity evidence could be admitted); see also id., 467 (citing *State* v. *Ellis*, supra, 270 Conn. 358–59, as case in which evidence did not meet liberal common plan or scheme exception for similar prior sexual misconduct). Therefore, *DeJesus* in no way undermines the vitality of the reasoning in *Ellis*.

determine that two factors have been met. First, the evidence must be relevant to prove a propensity to commit the sexual acts with which the defendant has been charged, such relevancy to be established by satisfying the liberal standard pursuant to which evidence previously had been admitted under the common scheme or plan exception. Id., 473. Second, "evidence of uncharged misconduct is admissible only if its probative value outweighs the prejudicial effect that invariably flows from its admission." (Internal quotation marks omitted.) Id.

Applying the *DeJesus* rubric, we conclude that the facts alleged in the case involving M were too dissimilar from the other two cases and that the prejudicial effect of that evidence was too overwhelming to support cross admissibility in the cases involving D and J. Because we conclude that the evidence regarding M was not cross admissible and because that conclusion was the underlying predicate for the trial court's consolidation of the cases, we affirm the judgment of the Appellate Court insofar as it determined that the defendant is entitled to new trials.

Turning to the relevancy determination, we first consider the dissimilarity of the conduct at issue in the three cases.[8] Although the defendant improperly touched the breasts of D and J during a purportedly legitimate examination, his conduct toward M was markedly different, far more egregious and could in no way be mistaken for a proper medical examination. In addition to feeling her breasts with his fingertips and grabbing both of her breasts with his hands—the only conduct common to all three victims—the defendant kissed M on her cheeks, remarked that her breasts were soft and beautiful and

---

[8] Because we conclude that the defendant's conduct toward M was not remote in time from his conduct toward D and J, we confine our analysis to the other considerations.

pinched her nipples. *State* v. *Gupta*, supra, 105 Conn. App. 244–45. While he examined M's stomach, he remarked that it was flat, exposed the top of her " 'private area,' " tapped her pelvic bone and commented that she was shaved and that she was " 'so hot.' " Id., 245. Even after M told the defendant that the examination was over, he again firmly massaged M's breasts with both of his hands, asked if he could kiss her breasts, and although M replied " 'no,' " proceeded to put his mouth on each breast and to suck briefly on them. Id. When M jumped up from the table, pulled down her shirt and said, " 'No, we are done. That is enough,' " the defendant persisted by putting his hands underneath her shirt, grabbing her breasts, and asking to feel her while she was sitting up. Id. The Appellate Court's accurate summary of this evidence; id., 245–48; demonstrates, in short, that the case involving M reflected significant qualitative differences from those involving D and J that were not merely a matter of degree.[9]

[9] The dissent concludes that the evidence involving M was sufficiently similar to the evidence involving D and J so as to be cross admissible, and that, in concluding to the contrary by relying on the defendant's clearly more egregious conduct toward M, the majority has conflated the questions of relevance (similarity) and prejudice. The dissent, however, glosses over both substantial differences in the defendant's conduct toward M, as well as the significance of those differences in the context of the elements of the crime charged. The dissent concludes that the evidence would be cross admissible because "a reasonable juror could conclude that a person who engaged in the misconduct toward M had a propensity to touch the breasts of young, female patients for sexual gratification." It is evident, however, that this narrow area of similarity is far outweighed by the differences in conduct. If we were to represent the cases as a Venn diagram of intersecting circles, the circles representing D and J largely would share the same area, whereas the common area of those circles with the one representing M would be minimal. There is no precedent under our case law for critically dissecting the facts of the case to find a narrow area of commonality to allow cross admissibility. Instead, we view the conduct as a whole, in the context of the case. See, e.g., *State* v. *Boscarino*, 204 Conn. 714, 723, 529 A.2d 1260 (1987) (concluding that trial court improperly had consolidated four sexual assault cases because, although there were factual similarities, those similarities were insufficient to make evidence in each case cross

Similarly, we agree with the Appellate Court's comparison of the facts in the present case to those of *State* v. *Ellis*, supra, 270 Conn. 337, wherein this court concluded that the trial court had abused its discretion in consolidating the cases of the three victims "because the defendant's abuse of [the third victim] was substantially more egregious than his abuse of the other two [victims]." Id., 378. "In *Ellis*, the defendant was convicted of sixteen counts of sexual misconduct involving three victims. One victim claimed that the defendant had grabbed her breast through her clothing. Another victim claimed that the defendant had grabbed her breast through her clothing on two different occasions. Id., 345–46. The third victim claimed that the defendant had done several things to her, including, having sexual conversations with her, engaging her in 'phone sex'; id., 359; while telling her he was masturbating, grabbing her breast through her clothing on multiple occasions, touching her between her legs on multiple occasions, exposing himself to her, attempting to make her perform oral sex on him and forcibly kissing her. Id., 346–48." *State* v. *Gupta*, supra, 105 Conn. 247–48.

Although under the liberal standard, the similarities shared by the charged and the uncharged crimes need

admissible and joinder impaired defendant's right to jury's fair and independent consideration of evidence in each case). Moreover, with respect to D and J, the defendant's misconduct was that he palpated their breasts in a manner intended to convey that such conduct was for "a bona fide medical purpose . . . ." General Statutes § 53a-73a (a) (5). With respect to M, although the defendant's conduct during the first few moments of the examination was similar to his conduct with D and J, the more extensive and egregious conduct that followed, crediting M's testimony, reasonably could not be viewed as intending to represent that the defendant was engaged in such a bona fide medical purpose. Thus, the present case differs from the usual sexual assault case, because it is not merely the assaultive conduct at issue but also the creation of a pretext for engaging in the conduct. Under M's version of events, the defendant quickly abandoned any such pretext by his substantially more egregious acts. Thus, the dissimilarities are significant to the issues of both relevance and prejudice. See also footnote 11 of this opinion.

not be "so unusual and distinctive as to be like a signature"; (internal quotation marks omitted) *State* v. *Merriam*, 264 Conn. 617, 666, 835 A.2d 895 (2003); they still must be sufficiently similar. *State* v. *McKenzie-Adams*, supra, 281 Conn. 525 (trial court properly admitted uncharged misconduct evidence to prove common scheme or plan because victims similarly were situated and "defendant's sexual misconduct with [the victims] was sufficiently similar"). On the basis of the aforementioned facts of the present cases, the similarities did not meet that standard. We agree with the Appellate Court that the defendant's conduct toward D and J resembled that directed against two of the victims in *Ellis* and his conduct toward M resembled the conduct toward the third *Ellis* victim, whose case was deemed not sufficiently similar and thus not relevant for *DeJesus* purposes.[10]

Another factor that we must consider in the relevancy determination is the similarity of the alleged victims. Undoubtedly, all three of the victims share some features. They are all female and each was the defendant's patient when the alleged assaults occurred. M, however, also had a four year employment relationship with the defendant's medical group preceding the date of the alleged assault, whereas J and D had no relationship with him other than a physician-patient relationship. Cf. *State* v. *Ellis*, supra, 270 Conn. 361 (concluding that one victim was dissimilar from other young female victims because, unlike others, she was not member of defendant's softball team, did not have frequent contact with defendant and "[e]ven more significantly, she did not feel compelled, as did the other [victims], to cultivate or continue a relationship with the defendant following the abuse because of his ability to assist her in

---

[10] Although the dissent attempts to distinguish *Ellis* from the facts of the present case, the dissent's reasoning essentially disavows the holding of the case, which still is good precedent.

obtaining a college softball scholarship"). M's status did not end when the defendant began his examination. Indeed, based on this difference in relationship, the defendant asserted a markedly different defense in the case involving M than he asserted in the cases involving J and D.[11]

Having concluded that the facts alleged in the case involving M were dissimilar from the facts alleged in the other two cases, we next address whether the probative value of the cross admissibility of evidence in these cases would nonetheless outweigh "the prejudicial effect that invariably flows from its admission." (Internal quotation marks omitted.) *State* v. *DeJesus*, supra, 288 Conn. 473; see *State* v. *Smith*, 275 Conn. 205, 218, 881 A.2d 160 (2005) ("[t]he test for determining whether evidence is unduly prejudicial is not whether it is damaging to the defendant but whether it will improperly arouse the emotions of the jury" [internal quotation marks omitted]). In this case, the inevitable dangers of joinder derive from the likelihood that the jury improperly considered evidence of the defendant's conduct toward M to convict the defendant of the charges stemming from his conduct toward J[12] even though that

_____

[11] The defendant contended that M had lied and that her allegations were intended to advance her financial interests, which the defendant claimed was evidenced by the facts that, after the alleged assault, M both retained counsel who negotiated a package whereby she received $10,000 from the defendant's medical group and accepted three months severance pay, health insurance and an agreement from the medical group not to contest unemployment compensation. The defendant did not claim that D and J had lied, but, rather, that they had misinterpreted the defendant's legitimate examination. The concurrence, in concluding that the only significant basis upon which to distinguish the case involving M from those involving J and D is the difference between the defenses asserted by the defendant in those cases, overlooks the fact that this difference results from *both* the nature of the relationship between each victim and the defendant and the nature and severity of the alleged conduct directed at each victim.

[12] Although the jury found the defendant not guilty in the case pertaining to D, we do not consider that outcome to be dispositive evidence that it was able to consider each of the cases separately. Once again, as the Appellate Court majority noted: "The state made this same argument in [*State* v.

evidence would have been inadmissible at a separate trial. "Joinder gave the state the opportunity to present the jury with the intimate details of each of these offenses, an opportunity that would have been unavailable if the cases had been tried separately." *State* v. *Boscarino*, 204 Conn. 714, 723, 529 A.2d 1260 (1987). Indeed, the obvious and blatant misconduct involving M severely undermined the defendant's ability to assert credibly the defense that the examinations of both D and J were medically legitimate, a point that the concurrence makes as well.

Nevertheless, despite our determination that the prejudicial effect of the evidence regarding M was too overwhelming to support the cross admissibility in the cases involving D and J, we still must consider whether the trial court abused its discretion in joining the cases.[13]

*Boscarino*, 204 Conn. 714, 724, 529 A.2d 1260 (1987)], in which our Supreme Court was unpersuaded and stated, '[w]e can only speculate as to why the jury rendered varying conclusions as to the defendant's guilt in the four cases. It is beyond our power to probe the minds of the jurors in order to determine what considerations influenced their divergent verdicts.' " *State* v. *Gupta*, supra, 105 Conn. App. 250.

[13] Although the presumption in favor of joinder is based on the rationale that it fosters judicial economy; see *State* v. *Ellis*, supra, 270 Conn. 375; there is legitimate debate about whether the interests favoring joinder should be weighed differently when both the offenses are not legally related and the evidence is not cross admissible. As one treatise has observed: "The argument for joinder is most persuasive when the offenses are based upon the same act or criminal transaction, since it seems unduly inefficient to require the state to resolve the same issues at numerous trials. Commentators have been generally critical, however, of the joinder of offenses which are unrelated, since the need to prove each offense with separate evidence and witnesses eliminates any real savings in time or efficiency which might otherwise be provided by a single trial." A. Spinella, Connecticut Criminal Procedure (1985) p. 416. As the Fourth Circuit Court of Appeals has noted as a general matter: "[A]lthough it is true that the [f]ederal [r]ules of [c]riminal [p]rocedure [were] designed to promote economy and efficiency and to avoid a multiplicity of trials . . . we are of the strong opinion that the consideration of one's constitutional right to a fair trial cannot be reduced to a cost/benefit analysis. Thus, while we are concerned with judicial economy and efficiency, our overriding concern in an instance such as this is that [the] jury consider only relevant and competent evidence bearing on

In other words, we have stated that "[s]ubstantial prejudice does not necessarily result from a denial of severance even [if the] evidence of one offense would not have been admissible at a separate trial involving the second offense." (Internal quotation marks omitted.) *State* v. *Randolph*, 284 Conn. 328, 337, 933 A.2d 1158 (2007). We still examine a variety of factors in deciding whether severance was necessary to avoid undue prejudice resulting from consolidation of multiple charges for trial. Id., 337–38; see also *State* v. *Boscarino*, supra, 204 Conn. 724. In examining the issue, we in effect weigh the risk that the jury will improperly use evidence that is introduced for proper purposes, despite the instructions of the court regarding the proper use of that evidence. This indeed is similar to the process that our courts employ in determining the admissibility of evidence regarding prior convictions and other misconduct of the defendant. See *State* v. *Rivera*, 221 Conn. 58, 72–73, 602 A.2d 571 (1992).

Accordingly, we turn again to the Appellate Court's recitation of the general inherent risks associated with improper joinder as well as the specific dangers evident in the present appeal. "Throughout the trial and numerous times in the charge to the jury, the court told the jury to consider the three cases separately. Nevertheless, there was some prejudice to the defendant that even proper instructions from the court could not cure. . . . '[A]n improper joinder may expose a defendant to potential prejudice for three reasons. First, when several charges have been made against the defendant, the jury may consider that a person charged with doing so many things is a bad [person] who must have done

the issue of guilt or innocence for each individually charged crime separately and distinctly from the other." (Citation omitted; internal quotation marks omitted.) *United States* v. *Isom*, 138 Fed. Appx. 574, 581 (4th Cir. 2005), cert. denied, 546 U.S. 1124, 126 S. Ct. 1103, 163 L. Ed. 2d 915 (2006). Because we conclude on the basis of our jurisprudence that joinder was improper, we need not weigh in on this debate.

something, and may cumulate evidence against him
. . . . Second, the jury may have used the evidence of
one case to convict the defendant in another case even
though that evidence would have been inadmissible at
a separate trial. . . . [Third] joinder of cases that are
factually similar but legally unconnected . . . pre-
sent[s] the . . . danger that a defendant will be sub-
jected to the omnipresent risk . . . that although so
much [of the evidence] as would be admissible upon
any one of the charges might not [persuade the jury]
of the accused's guilt, the sum of it will convince them
as to all.' . . .

"In the present case, some of these risks are present.
For instance, there were several charges made against
the defendant, and this litany of charges may have con-
vinced the jury that he had to have committed at least
one of the crimes with which he was charged. Second,
the jury may have cumulated the evidence from all of
the cases to find the defendant guilty in J's and M's
cases. The insufficiency of the court's repeated admoni-
tions against cumulating the cases became obvious dur-
ing the foreperson's reading of the verdict. When asked
if the jury found the defendant guilty in the first case,
the foreperson replied, 'guilty.' Next, the court clerk
asked whether the jury had found the defendant guilty
in the second case, and the foreperson replied, 'I am
not sure I understand that. Are we separating the three
girls?' " (Citation omitted.) *State* v. *Gupta*, supra, 105
Conn. App. 249–50.

In summary, because the defendant's behavior with
respect to M was far more egregious than his behavior
with respect to J and D, and the evidence of that behav-
ior was far more prejudicial than probative, we con-
clude that the defendant was deprived of his right to a
fair trial by the improper joinder of the cases. Accord-
ingly, we affirm the judgment of the Appellate Court

insofar as it determined that the trial court improperly consolidated the cases.[14]

## II

Although our conclusion in part I requires that the cases be remanded to the trial court for new trials, we also address the evidentiary issues raised in this certified appeal because those issues are likely to arise again on remand. See *State* v. *Cote*, 286 Conn. 603, 627, 945 A.2d 412 (2008); *State* v. *Kirby*, 280 Conn. 361, 387–88, 908 A.2d 506 (2006). We therefore turn to the state's claim that the Appellate Court improperly concluded that the trial court had abused its discretion in excluding from evidence two videotapes explaining the proper technique for performing a physical examination and several excerpts from medical treatises. We conclude that the Appellate Court properly concluded that the trial court had abused its discretion in excluding the videotapes, but improperly concluded that the trial court had abused its discretion in excluding the treatises.

The following additional facts and procedural history are relevant to our resolution of this issue. Before trial, the state filed a motion in limine to preclude the defendant from using two instructional videotapes demonstrating how to perform a physical examination of a patient. One of the videotapes was labeled, "A Visual Guide to Physical Examination–Barbara Bates, M.D.– Thorax and Lungs–1995 J.B. Lippincott Company"

---

[14] The dissent suggests that, even if we properly have concluded that the evidence of the defendant's behavior with respect to M was more prejudicial than probative, we nevertheless should not grant the defendant a new trial in the case involving J. We disagree. The improper joinder of the cases gave the state the opportunity to present the jury with the intimate details of each of these offenses, an opportunity that otherwise would have been unavailable had the cases been tried separately. Accordingly, we do not provide relief in only the least inflammatory case. See, e.g., *State* v. *Boscarino*, supra, 204 Conn. 725.

(Bates videotape), and the other was labeled "In Performing the Physical Examination–Presented by J.L. Sherman, M.D.–Thorax and Lungs–Produced by Medical Media Production Service–VA Hospital, Northport, NY" (Sherman videotape). In the Bates videotape, the narrator stated that the middle lobe of the right lung underlies a woman's right breast and that it might be necessary to displace the breast to examine the lung. Thereafter, the person performing the examination demonstrated the proper technique for examining the anterior thorax. She removed the patient's hospital gown from his torso, directed the patient to lie on his back and palpated his chest, including his breasts, with her fingers. The examiner palpated one breast at a time using the fingers of one hand. She then demonstrated the technique for palpating for tactile fremitus.[15] She placed her right hand alternately on each side of the patient's chest, including his breasts, and applied pressure. The narrator stated that, because fremitus may be difficult to feel through a woman's breast tissue, the examiner may need to displace the breast. The person performing the examination then demonstrated the technique for auscultation[16] of the lungs. She held her stethoscope in one hand and placed it alternately on each side of the patient's chest, including on his breasts. The narrator stated that gentle displacement of a woman's breasts might be necessary for proper auscultation.

On the Sherman videotape, the narrator stated that a person performing a routine chest examination should never perform a less thorough examination than was demonstrated in the videotape. He also stated that a

---

[15] Tactile fremitus is the vibration felt by a hand placed on the chest of an individual who is speaking. See The American Heritage Stedman's Medical Dictionary (1995).

[16] "[A]uscultation" is defined as "[t]he act of listening for sounds made by internal organs, such as the heart and lungs, to aid in the diagnosis of certain disorders." The American Heritage Stedman's Medical Dictionary (1995).

breast examination routinely should be done on males, as well as females. The person demonstrating the breast examination in the videotape used the fingers of both hands to palpate each of the patient's breasts alternately. She then pressed the palms of both hands simultaneously on both sides of the patient's chest at several locations between his collarbone and his lower ribs, including his breasts. She also percussed alternate sides of the patient's chest at various locations from his collarbone to his lower ribs, including his breasts, and placed her stethoscope on several locations between and on the patient's breasts.

The state objected to the admission of the videotapes on multiple grounds, namely, that (1) it was unclear who the persons in the videotapes were and whether they were qualified to give opinions on proper examination technique; (2) it was unclear where the videotapes had come from; (3) the videotapes were hearsay; and (4) the videotapes were irrelevant because they appeared to depict general physical examinations rather than pulmonary examinations. The defendant argued that the videotapes were admissible because his expert witness was prepared to testify that they demonstrated the proper technique for performing a pulmonary examination, including touching and feeling the patient's breasts. He further argued that experts are allowed to rely on hearsay evidence to support their opinions.[17] The trial court granted the state's motion in limine with respect to the videotapes on the ground that they were irrelevant and potentially misleading.

Thereafter, during Roux' testimony at trial, counsel for the defendant showed Roux excerpts from twelve

[17] "Hearsay is inadmissible except as provided in the Connecticut Code of Evidence, the General Statutes or our rules of practice. Conn. Code Evid. § 8-2. An expert witness may rely on the facts otherwise not admissible in evidence if they are customarily relied on by experts in the particular field in forming opinions on the subject." *Johnson* v. *Johnson*, 111 Conn. App. 413, 418, 959 A.2d 637 (2008).

textbooks and treatises on physical examination and Roux testified that they corroborated her testimony regarding the proper technique for performing a pulmonary examination. Counsel for the defendant then offered the excerpts as exhibits and the prosecutor objected on the ground that the copies were not complete, that they were not written by experts in pulmonology and that treatises are not admissible. The defendant argued that treatises relied on by an expert are admissible under § 8-3 (8) of the Connecticut Code of Evidence,[18] and that the excerpts were relevant because they corroborated Roux' testimony. The trial court concluded that the excerpts were irrelevant because "the issues that the jury must decide [in] this case have to do with a sexual assault and not the details of the examinations . . . . The [c]ourt also believes [that the excerpts are] cumulative of the evidence that's coming in through this witness and [through Thomas] Godar," a physician specializing in pulmonary medicine who testified as an expert witness for the state. Although the court sustained the state's objection to the admission of the excerpts as evidence, it allowed counsel for the defendant to ask Roux questions about the excerpts.

Counsel for the defendant then questioned Roux about each of the twelve excerpts.[19] Although the trial

---

[18] Section 8-3 (8) of the Connecticut Code of Evidence provides: "To the extent called to the attention of an expert witness on cross-examination or relied on by the expert witness in direct examination, [the hearsay rule does not require exclusion of] a statement contained in a published treatise, periodical or pamphlet on a subject of history, medicine, or other science or art, recognized as a standard authority in the field by the witness, other expert witness or judicial notice."

[19] Specifically, counsel for the defendant asked Roux about an excerpt that stated that the examining physician " 'should arrange the patient's gown so that [the physician] can see the chest fully.' " Roux agreed with that statement. She also agreed with several excerpts stating that the patient should be undressed to the waist and with excerpts stating that the breasts of male and female patients should be palpated in the same way, that palpation should be done with the patient in a supine position, that the examination should be done in a systematic way so that the physician does not miss problems that the patient has not complained of, and that the

court did not allow counsel for the defendant to show the photographs contained in the excerpts to the jury, he allowed Roux to demonstrate the techniques shown in the photographs on herself. She demonstrated the technique for feeling for fremitus and for displacing the breast for percussion of the chest. In addition, the trial court allowed counsel for the defendant to question Godar about several of the excerpts and to show some of the photographs in the excerpts to the jury during cross-examination of Godar.

Our standard of review for evidentiary claims is well settled. "We review the trial court's decision to admit evidence, if premised on a correct view of the law . . . for an abuse of discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . In determining whether there has been an abuse of discretion, the ultimate issue is whether the court could reasonably conclude as it did." (Citations omitted; internal quotation marks omitted.) *State* v. *Orr*, 291 Conn. 642, 666–67, 969 A.2d 750 (2009).

"Evidence is relevant if it has any tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence. Conn. Code Evid. § 4-1. Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . One fact is relevant to another if in the common course of events the existence of one, alone or with other facts, renders the existence of the other either more certain or more probable. . . . Evidence is not rendered inadmissible because it is not conclusive. All that is required is that the evidence tend to support a relevant fact even to a slight degree, [as] long

physician should meticulously palpate all areas of the chest for tenderness, bulges or abnormal movements.

as it is not prejudicial or merely cumulative." (Internal quotation marks omitted.) *State* v. *Bonner*, 290 Conn. 468, 496–97, 964 A.2d 73 (2009); see also Conn. Code Evid. § 4-3 ("[r]elevant evidence may be excluded if its probative value is outweighed . . . by considerations of . . . needless presentation of cumulative evidence").

"Under Connecticut law, if a medical treatise is recognized as authoritative by an expert witness and if it influenced or tended to confirm his opinion, then relevant portions thereof may be admitted into evidence in the exercise of the trial court's discretion. . . . This approach differs from that of most other jurisdictions, including the federal rule, in that we allow the material to be taken into the jury room as a full exhibit. . . . Most other jurisdictions bar such material from the jury room, limiting their use to an oral reading in connection with an expert witness' testimony. . . . This limitation seeks to avoid the danger of misunderstanding or misapplication by the jury and ensures that the jurors will not be unduly impressed by the text or use it as a starting point for reaching conclusions untested by expert testimony. . . . The Connecticut rule, on the other hand, has the advantage of allowing the jurors to examine more fully the text of what frequently is a technical and complicated discussion that may be unfathomable to a nonexpert juror who merely heard a single oral recitation. Although the concerns which underlie the federal rule cannot be completely obviated when the materials are allowed in the jury room, the dangers can be minimized by the judicious exercise of discretion by the trial court in deciding which items ought to be admitted as full exhibits." (Citations omitted.) *Cross* v. *Huttenlocher*, 185 Conn. 390, 395–97, 440 A.2d 952 (1981); see also Conn. Code Evid. § 8-3 (8).

Turning first to the treatise, we recognize that the excerpts corroborated Roux' testimony that a proper

pulmonary examination involves touching and palpating the patient's breasts. Therefore, the excerpts ordinarily would be probative and not merely cumulative of her testimony. Because defense counsel was allowed to question Roux about each of the excerpts, however, and Roux was allowed to demonstrate to the jury the techniques shown in the photographs contained in the excerpts and to testify that the excerpts corroborated her testimony; see State v. Gupta, supra, 105 Conn. App. 253; the trial court reasonably concluded that the admission of the excerpts as full exhibits was unnecessary and could possibly unduly confuse the jury. We conclude, therefore, that, under these particular circumstances, the trial court did not abuse its broad discretion when it ruled that the excerpts could not be admitted as full exhibits and brought into the jury room.

With respect to the two videotapes, we agree with the Appellate Court that portions of them corroborated Roux' testimony that the defendant's examination of the complainants was medically proper and, therefore, the videotapes were both probative and not needlessly cumulative. See id., 254. We also agree that the videotapes would not have been unduly misleading because the parties could have submitted the videotapes to their experts and questioned the experts about them. See id., 254–55. Accordingly, we conclude that the Appellate Court properly determined that the trial court had abused its discretion in excluding the videotapes.

The judgment of the Appellate Court is reversed in part and the case is remanded with direction to order a new trial in each of the two cases involving J and M.

In this opinion ZARELLA, McLACHLAN and ROBINSON, Js., concurred.

PALMER, J., concurring. I agree with the majority that the Appellate Court properly concluded that the

trial court had abused its discretion in consolidating for trial the three separate cases against the defendant, Sushil Gupta. In particular, I agree that it was improper for the trial court to consolidate the case involving the victim M with the cases involving the victim J and the victim D.

I reach this conclusion, however, on the basis of reasoning that is different from that of the majority, which concludes that joinder of the case involving M with the cases involving J and D constituted an abuse of discretion primarily because the conduct of the defendant toward M was "markedly different" from and "far more egregious" than his conduct toward J and D. Thus, the majority takes the position that the case involving M was different in kind from the cases involving J and D—and, therefore, not sufficiently similar to justify consolidation—because the former case "reflected significant qualitative differences from those involving D and J that were not merely a matter of degree." In reaching this conclusion, the majority focuses on what the defendant did and said to the three victims, separate and apart from the fact that the defendant is a physician whose conduct toward each victim occurred during the course of a medical examination.

In determining whether the defendant was entitled to a severance, I do not believe that it is appropriate to view the defendant's conduct through such a narrow lens. Indeed, I am not persuaded that, when viewed in that narrow manner, the defendant's conduct toward M was so much more serious than his conduct toward J and D as to render it qualitatively different or different in kind.[1] That is, if we were to put aside the fact that

---

[1] In this regard, the other crimes evidence at issue in the present case more closely resembles the facts of *State* v. *McKenzie-Adams*, 281 Conn. 486, 491–97, 915 A.2d 822 (2007), in which the court concluded that the other crimes evidence was admissible; id., 516–17, 532–33; than the facts of *State* v. *Ellis*, 270 Conn. 337, 342–51, 852 A.2d 676 (2004), in which the court concluded that the other crimes evidence was inadmissible. Id., 352, 365.

the defendant is a physician who was examining the victims when he allegedly assaulted them sexually and to focus solely on the nature of the defendant's actions toward the victims, separate trials would not be necessary due merely to any inherent differences in the severity of the defendant's conduct toward those victims. There nevertheless *is* a real difference between the case involving M, on the one hand, and the cases involving J and D, on the other; with respect to his conduct toward J and D, the defendant has a plausible claim that his conduct was medically legitimate, whereas his conduct toward M, if it occurred, was indefensible by any standard. In other words, the defendant's conduct toward M was dissimilar to his conduct toward J and D—and, therefore, inadmissible as propensity evidence in the cases involving J and D—not because the defendant's conduct toward M was significantly more egregious than his conduct toward J and D but because the defendant's conduct toward J and D arguably was justified, whereas his conduct toward M was not. *That* difference is significant for the purpose of determining whether a severance was required because, in the circumstances presented, it is unlikely that the jury, in the joint trial of all three cases, was able to evaluate fairly the defendant's claim that his conduct involving J and D was medically legitimate once it learned of the defendant's conduct toward M. It therefore was unduly prejudicial for the court to consolidate for trial the case involving M with the cases involving J and D.

The majority asserts that, "in concluding that the only significant basis [on] which to distinguish the case involving M from those involving J and D is the difference between the defenses asserted by the defendant in those cases, [I have] overlook[ed] the fact that this difference results from *both* the nature of the relationship between each victim and the defendant and the nature and severity of the alleged conduct directed at

each victim." (Emphasis in original.) Footnote 11 of the majority opinion. The majority is incorrect. Although the defendant's conduct toward M was somewhat more serious than his conduct toward J and D, that difference is not the reason why a severance is required. In other words, it is not the reason why his conduct toward M is dissimilar to his conduct toward J and D for the purpose of determining the cross admissibility of the three incidents as propensity evidence. A severance is necessary, rather, because the defendant's conduct toward J and D supports a colorable claim that that conduct was medically appropriate, whereas his conduct toward M does not. Thus, although it so happens that the severity of the defendant's conduct toward M is somewhat greater than the severity of his conduct toward J and D, a severance would not be required, despite that difference in severity, but for the fact that the defendant has a plausible defense that his conduct toward J and D was medically appropriate and has no such colorable defense with respect to his conduct toward M. Indeed, a severance also would have been required even if the defendant's conduct involving M had been *less* serious than his conduct involving J and D, as long as the defendant's conduct toward M was such that it could not plausibly be deemed to be medically appropriate. In sum, in the particular circumstances of this case, the critical consideration for purposes of severance is not the relative severity of the defendant's conduct toward each of the three victims but, rather, the fact that his conduct toward J and D arguably was defensible and his conduct toward M was not.

Finally, I also agree with the majority that the Appellate Court properly determined that the trial court had abused its discretion in excluding the two videotapes from evidence. For the reasons set forth by the Appellate Court, however; see *State* v. *Gupta*, 105 Conn. App.

237, 251–52, 937 A.2d 746 (2008); I would conclude that the trial court also abused its discretion in precluding the defendant from introducing excerpts from medical treatises into evidence. I therefore concur in the result that the majority reaches.

ROGERS, C. J., with whom VERTEFEUILLE, J., joins, dissenting. The majority concludes in part I of its opinion that the trial court improperly consolidated the three cases against the defendant, Sushil Gupta, because "his conduct toward [the victim] M was markedly different, far more egregious and could in no way be mistaken for a proper medical examination." In part II of its opinion, the majority concludes that the trial court did not abuse its discretion when it excluded from evidence excerpts from certain medical treatises, but that it improperly excluded certain videotapes demonstrating the technique for a pulmonary examination. Accordingly, the majority affirms the judgment of the Appellate Court reversing the judgment of conviction. I agree with the majority's conclusion that the trial court properly excluded the excerpts from the medical treatises. I would conclude, however, that the trial court did not abuse its broad discretion in consolidating the three cases and that its exclusion of the videotapes was improper, but harmless. Accordingly, I would reverse the judgment of the Appellate Court.

I first address the majority's conclusion that the Appellate Court properly determined that the trial court improperly consolidated the three cases involving M, and two other victims, J and D. I begin with the standard of review. "General Statutes § 54-57[1] and Practice Book

[1] General Statutes § 54-57 provides: "Whenever two or more cases are pending at the same time against the same party in the same court for offenses of the same character, counts for such offenses may be joined in one information unless the court orders otherwise."

§ [41-19][2] authorize a trial court to order a defendant to be tried jointly on charges arising separately. In deciding whether to sever informations joined for trial, the trial court enjoys broad discretion, which, in the absence of manifest abuse, an appellate court may not disturb. . . . The defendant bears a heavy burden of showing that the denial of severance resulted in substantial injustice, and that any resulting prejudice was beyond the curative power of the court's instructions." (Citations omitted; internal quotation marks omitted.) *State* v. *Herring*, 210 Conn. 78, 94–95, 554 A.2d 686, cert. denied, 492 U.S. 912, 109 S. Ct. 3230, 106 L. Ed. 2d 579 (1989).

As the majority recognizes, "[when] evidence of one incident can be admitted at the trial of the other, separate trials would provide [a] defendant no significant benefit. It is clear that, under such circumstances, [a] defendant would not ordinarily be substantially prejudiced by joinder of the offenses for a single trial." (Internal quotation marks omitted.) *State* v. *McKenzie-Adams*, 281 Conn. 486, 520, 915 A.2d 822, cert. denied, 552 U.S. 888, 128 S. Ct. 248, 169 L. Ed. 2d 148 (2007).

As the majority also recognizes, this court recently has recognized an "exception to the prohibition on the admission of uncharged misconduct evidence in *sex crime* cases to prove that the defendant had a propensity to engage in aberrant and compulsive criminal sexual behavior." (Emphasis in original.) *State* v. *DeJesus*, 288 Conn. 418, 470, 953 A.2d 45 (2008). Thus, the evidence in sex crime cases ordinarily will be cross admissible to establish propensity, subject to three important limitations. "First, evidence of uncharged sexual misconduct is admissible only if it is relevant to prove that

---

[2] Practice Book § 41-19, formerly Practice Book § 829, provides: "The judicial authority may, upon its own motion or the motion of any party, order that two or more informations, whether against the same defendant or different defendants, be tried together."

the defendant had a propensity or a tendency to engage in the type of aberrant and compulsive criminal sexual behavior with which he or she is charged. Relevancy is established by satisfying the liberal standard pursuant to which evidence previously was admitted under the common scheme or plan exception. Accordingly, evidence of uncharged misconduct is relevant to prove that the defendant had a propensity or a tendency to engage in the crime charged only if it is: (1) . . . not too remote in time; (2) . . . similar to the offense charged; and (3) . . . committed upon persons similar to the prosecuting witness. . . .

"Second, evidence of uncharged misconduct is admissible only if its probative value outweighs the prejudicial effect that invariably flows from its admission. . . . In balancing the probative value of such evidence against its prejudicial effect, however, trial courts must be mindful of the purpose for which the evidence is to be admitted, namely, to permit the jury to consider a defendant's prior bad acts in the area of sexual abuse or child molestation for the purpose of showing propensity. . . .

"Lastly, to minimize the risk of undue prejudice to the defendant, the admission of evidence of uncharged sexual misconduct under the limited propensity exception adopted herein must be accompanied by an appropriate cautionary instruction to the jury." (Citations omitted; internal quotation marks omitted.) Id., 473–74.

Evidence of prior sexual misconduct may be excluded as unduly prejudicial "(1) where the facts offered may unduly arouse the jur[ors'] emotions, hostility or sympathy, (2) where the proof and answering evidence it provokes may create a side issue that will unduly distract the jury from the main issues, (3) where the evidence offered and the counterproof will consume an undue amount of time, and (4) where the defendant,

having no reasonable ground to anticipate the evidence, is unfairly surprised and unprepared to meet it. . . . We note that [a]ll adverse evidence is [by definition] damaging to one's case, but [such evidence] is inadmissible only if it creates undue prejudice so that it threatens an injustice were it to be admitted. . . . Such undue prejudice is not measured by the significance of the evidence which is relevant but by the impact of that which is extraneous. . . . Thus, evidence is excluded as unduly prejudicial when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence." (Citations omitted; internal quotation marks omitted.) *State* v. *James G.*, 268 Conn. 382, 398–99, 844 A.2d 810 (2004).

Finally, this court has held that the state is not required to prove that an alleged act of prior misconduct occurred before it may be admitted. See *State* v. *Aaron L.*, 272 Conn. 798, 822–23, 865 A.2d 1135 (2005). Rather, "the trial court neither weighs credibility nor makes a finding that the [g]overnment has proved the conditional fact by a preponderance of the evidence. The court simply examines all the evidence in the case and decides whether *the jury* could reasonably find the conditional fact . . . by a preponderance of the evidence." (Emphasis in original; internal quotation marks omitted.) Id., 822; see also *State* v. *Cutler*, 293 Conn. 303, 322, 977 A.2d 209 (2009) (trial court properly instructed jury that it could consider evidence of uncharged misconduct if it found that evidence logically and rationally supported issue for which it was admitted and court was not required to instruct jury that state must prove that defendant committed uncharged misconduct by preponderance of evidence).

Applying these principles to the facts of this case, the majority concludes that, "[a]lthough the defendant improperly touched the breasts of D and J during a

purportedly legitimate examination, his conduct toward M was markedly different, far more egregious and could in no way be mistaken for a proper medical examination." I disagree. As a preliminary matter, I would point out that the majority appears to have conflated the question of whether the charged misconduct and the uncharged misconduct are similar, which goes to relevance, with the question of whether the uncharged misconduct was much more egregious than the charged conduct, which goes to prejudice. Specifically, the majority appears to have concluded that the defendant's misconduct toward M was dissimilar to his misconduct toward D and J for purposes showing propensity *because* it was more egregious. It is implicit in *DeJesus*, however, that misconduct evidence may be inadmissible because it is unduly prejudicial even though it is sufficiently similar to be probative on the issue of propensity. See *State* v. *DeJesus*, supra, 288 Conn. 473 ("evidence of uncharged sexual misconduct is admissible . . . if it is relevant to prove that the defendant had a propensity or a tendency to engage in the type of aberrant and compulsive criminal sexual behavior with which he or she is charged"); id. ("evidence of uncharged misconduct is admissible only if its probative value outweighs the prejudicial effect that invariably flows from its admission" [internal quotation marks omitted]). Accordingly, it is necessary to analyze separately the issue of whether the charged misconduct and uncharged misconduct are sufficiently similar to be probative and the issue of whether the prior misconduct is so much more egregious than the charged misconduct as to be unduly prejudicial. I would conclude that the misconduct toward M was similar to his misconduct toward D and J and that it was not so much more egregious as to be unduly prejudicial.

I first address the question of whether the defendant's conduct toward M was sufficiently similar to his con-

duct toward D and J to be admissible under *DeJesus*. As I have indicated, this court stated in that case that "evidence of uncharged sexual misconduct is admissible . . . if it is relevant to prove that the defendant had a propensity or a tendency to engage in the type of aberrant and compulsive criminal sexual behavior with which he or she is charged." Id. In my view, a reasonable juror could conclude that a person who engaged in the misconduct toward M had a propensity to touch the breasts of young, female patients for sexual gratification. Moreover, I disagree with the majority's conclusion that the victims were not similar because M was employed by "the defendant's medical group preceding the date of the alleged assault, whereas J and D had no relationship with him other than a physician-patient relationship." Again, under *DeJesus*, the state must establish that the victims are similar in order to raise an inference that the defendant has a propensity to engage in the type of conduct with which he is charged. Conversely, any dissimilarity between the victims is relevant only if it negates that inference. The fact that M, who, like D and J, was a young, female patient of the defendant's, also had a work relationship with the defendant does not negate the inference that the defendant had a propensity to grab the breasts of young, female patients.[3] Accordingly, I would conclude that the facts and circumstances of the case involving M were sufficiently similar to the facts and circumstances of the case involving D and J to be probative under *DeJesus*.

Accordingly, I turn to the question of whether the evidence of the defendant's misconduct toward M was so much more egregious than the evidence of his misconduct toward D and J that it was more prejudicial

[3] Later in this dissenting opinion, I address the majority's argument that M was different from D and J because the defendant claimed that M had a motive to lie about the defendant's conduct.

than probative. The majority appears to suggest that, even if the defendant *improperly* touched D's and J's breasts, that conduct was not nearly as egregious as the defendant's conduct toward M *because* his conduct toward D and J could have been mistaken for a proper medical examination. Contrary to the majority's suggestion, however, it is clear to me that the fact that D and J could have been mistaken or uncertain about the purpose of the defendant's manipulation of their breasts in no way excuses or ameliorates that conduct or renders it less offensive to the victims if it was, in fact, improper. Conversely, the fact that the defendant's conduct toward M could not be mistaken for a proper medical examination does not, in and of itself, make the conduct more egregious; it merely makes the conduct impossible to defend as a bona fide medical procedure. For example, if the defendant had merely kissed M on the mouth, the fact that such conduct could not be mistaken for a bona fide medical procedure would not render it more egregious than his conduct toward D and J, assuming such conduct was improper. Accordingly, the majority's comment that the defendant's conduct toward M "could in no way be mistaken for a proper medical examination" is entirely irrelevant to a proper analysis of whether the conduct was more egregious.

Turning to the details of the defendant's misconduct toward M, I do not agree that the misconduct, objectively considered, was so much more egregious than the misconduct in the cases involving D or J that it would "unduly arouse the jur[ors'] emotions, hostility or sympathy . . . ." (Internal quotation marks omitted.) *State* v. *James G.*, supra, 268 Conn. 398. I see no qualitative difference between directing a patient to expose her chest and then grabbing her breasts under false pretenses and directing a patient to expose her chest and then grabbing and kissing her breasts under

false pretenses, while making inappropriate comments. Rather, I would conclude that the difference in the defendant's conduct toward the three victims was a matter of degree, not of kind, and was not significant. See *State* v. *McKenzie-Adams*, supra, 281 Conn. 531 ("the fact that R.S. suffered less severe sexual misconduct than N.R. and P.L. does not illustrate a behavioral distinction of any significance" [internal quotation marks omitted]);[4] *State* v. *James G.*, supra, 388–89 (common scheme or plan testimony by witness admissible when defendant's early abuse of witness was similar to abuse of victim). I recognize that the admission of the evidence of misconduct toward M was undoubtedly damaging to the defendant in the cases involving D and J. Propensity evidence may be excluded as unduly prejudicial, however, only "when it tends to have some adverse effect upon a defendant *beyond* tending to prove the fact or issue that justified its admission into evidence." (Emphasis added; internal quotation marks omitted.) *State* v. *James G.*, supra, 399. Thus, the evidence of the misconduct toward M was not inadmissible merely because it was extremely probative in the cases involving D and J, by tending to negate any uncertainty about the purpose of the defendant's conduct. Accordingly, I would conclude that the trial court did not abuse its broad discretion in consolidating the cases.

---

[4] In *McKenzie-Adams*, the defendant made sexual comments to a victim, R.S., and hugged her in a sexual manner. See *State* v. *McKenzie-Adams*, supra, 281 Conn. 527–28. The defendant was not charged with this conduct. The defendant also engaged in extensive sexual activity with another victim, N.R., including kissing her, penetrating her vagina digitally and performing oral sex on her; id., 491–93; and with another victim, P.L., including penetrating her vagina digitally and having penile-vaginal sexual intercourse. Id., 493–96. This court concluded that evidence of the defendant's uncharged sexual misconduct with R.S. was admissible in the cases involving N.R. and P.L. to show common scheme and plan. Id., 532–33. In addition, this court concluded that the evidence in the cases involving N.R. and P.L. was cross admissible. See id., 527.

In support of its conclusion to the contrary, the majority relies heavily on this court's decision in *State* v. *Ellis*, 270 Conn. 337, 852 A.2d 676 (2004). In that case, the victim was charged with sexual misconduct in three cases involving Sarah S., Julia S. and Kristin C. Id., 339–41. In the cases involving Julia S. and Kristin C., the defendant had grabbed and fondled the victims' breasts. Id., 359–60. In the case involving Sarah S., the defendant had spoken to her about sexual matters; asked her to have phone sex with him while telling her that he was masturbating; grabbed her breasts over her school uniform and attempted to touch her between the legs; and exposed himself to her, attempted to force her to touch his penis and to perform oral sex on him, and masturbated when she refused. Id., 347–48. At trial, the state introduced evidence of uncharged misconduct involving Sarah S. and a fourth victim, Kaitlyn M. Id., 359. The uncharged misconduct toward Sarah S. involved entering her room and masturbating next to her bed, touching her breasts under her shirt, penetrating her vagina digitally and attempting to climb on top of her in bed. Id., 348–49. The uncharged misconduct involving Kaitlyn M. involved making sexual comments, touching her leg and kissing her. Id., 360. All four victims were between the ages of thirteen and sixteen years old at the time that the defendant first engaged in sexual misconduct with them. See id., 344 (Julia S. was fourteen years old); id., 345 (Kristin C. was thirteen years old); id., 347 (Sarah S. was fourteen years old); id., 350 (Kaitlyn M. was fifteen or sixteen years old).

This court concluded that the trial court improperly had admitted evidence of the defendant's conduct toward Julia S., Kristin C., and Kaitlyn M. in the case involving Sarah S. because "although the defendant's abuse of Julia S., Kristin C. and Kaitlyn M. bore some similarities, it had very little in common with his abuse of Sarah S." Id., 360. In addition, because the defen-

dant's relationship with Sarah S. differed in some respects from his relationship with the other victims, this court concluded that "it cannot be inferred logically that, if the defendant was guilty of the charged and uncharged offenses involving Julia S., Kristin C. and Kaitlyn M., he also must have been guilty of the charged offenses involving Sarah S." Id., 361.

This court then *rejected* the state's claims that "misconduct evidence offered in support of a common plan or scheme need only be similar to the charged misconduct for the logical inference to be made that, if the defendant is guilty of one, he must be guilty of the other"; id.; and that "the charged and uncharged misconduct do not have to be identical acts, but only similar enough to justify the conclusion that [the charged conduct] is at least a reasonable facsimile of the prior incident[s]." (Internal quotation marks omitted.) Id., 361–62. Instead, this court appears to have concluded that there must be "more similarities than dissimilarities between the uncharged misconduct [evidence and the charged conduct evidence]"; id., 362; and that the severity of the uncharged misconduct and the charged misconduct must be "not identical, [but] more or less equivalent." Id., 363.

To the extent that this court in *Ellis* rejected the state's claim that evidence of uncharged misconduct in sex cases is relevant if it raises the logical inference that, if the defendant was guilty of one offense, he is guilty of the other, I disagree. Both before and after *Ellis*, our cases addressing the admissibility of evidence of uncharged misconduct in sex cases consistently have applied this standard. See *State* v. *DeJesus*, supra, 288 Conn. 473 (evidence of uncharged misconduct in sex cases is relevant if it tends "to prove that the defendant had a propensity or a tendency to engage in the type of aberrant and compulsive criminal sexual behavior with which he or she is charged"); see also *State* v.

*Snelgrove*, 288 Conn. 742, 759, 954 A.2d 165 (2008) (same); *State* v. *McKenzie-Adams*, supra, 281 Conn. 522 (evidence of uncharged misconduct is relevant in sex case when "the marks which the uncharged and the charged offenses have in common [are] such that it may be logically inferred that if the defendant is guilty of one he must be guilty of the other" [internal quotation marks omitted]); *State* v. *Kulmac*, 230 Conn. 43, 61, 644 A.2d 887 (1994) (same); *State* v. *Esposito*, 192 Conn. 166, 172, 471 A.2d 949 (1984) (same); *State* v. *Hauck*, 172 Conn. 140, 147, 374 A.2d 150 (1976) (trial court did not abuse its discretion in admitting evidence of uncharged misconduct when evidence of uncharged offense would "justify the indication that the commission of one would tend to directly affect the principal crime" [internal quotation marks omitted]). Indeed, this is the standard that this court applied in *Ellis* before apparently rejecting it.

Moreover, it is entirely unclear to me what principles this court applied in *Ellis* to conclude that the defendant's misconduct toward Sarah S. was not sufficiently similar to his conduct toward the other victims for the evidence in the cases to be cross admissible. This court suggested that there must be "more similarities than dissimilarities"; *State* v. *Ellis*, supra, 270 Conn. 362; between the charged and uncharged misconduct and the severity of all of the alleged misconduct must be "more or less equivalent." Id., 363. This court did not explain, however, why the charged conduct and the uncharged misconduct must share similarities beyond those required to raise a reasonable inference that a person who engaged in the uncharged misconduct would probably engage in the charged misconduct or what standard the trial court should apply in determining whether the similarities are sufficient.[5] As I have

---

[5] This court in *Ellis*, like the majority in the present case, apparently confused the question of whether the uncharged misconduct and the charged misconduct were sufficiently similar to be probative on the question of

indicated, this court consistently had held that the similarities need only be sufficient to raise such an inference, and I believe that standard was met in *Ellis*. In my view, a reasonable juror could conclude that a person who has grabbed the breasts of three teenaged girls while in the vicinity of other persons would have a propensity to engage in escalated sexual misconduct toward teenaged girls when there is a reduced risk of discovery.[6]

I next address this court's determination in *Ellis* that the trial court improperly had consolidated the three cases involving Sarah S., Julia S. and Kristin C. "because the defendant's abuse of Sarah S. was substantially more egregious than his abuse of the other two girls. Consequently, joinder prevented the jury from an impartial consideration of the charges in the latter two cases." Id., 378. I recognize that the question of whether the defendant's misconduct toward Sarah S. was so much more egregious than his misconduct toward the other victims that joinder of the cases was prejudicial is a closer question than the question of whether the conduct was sufficiently similar to raise a reasonable inference that, because the defendant had engaged in the conduct toward Sarah S., he had engaged in the conduct

propensity with the question of whether the defendant's misconduct with one of the victims was significantly more egregious, which goes to prejudice. As in *Ellis*, the standard adopted by the majority in the present case provides little guidance to our trial courts. The majority first acknowledges that the "similarities shared by the charged and the uncharged crimes need not be so unusual and distinctive as to be like a signature"; (internal quotation marks omitted); and then concludes that they need only "be sufficiently similar." The majority provides no guidance, however, as to how the trial court should determine what degree of similarity is sufficient or for what purpose it must be sufficient.

[6] The abuse of Julia S., Kristin C. and Kaitlyn M. "occurred in the vicinity of other persons"; *State* v. *Ellis*, supra, 270 Conn. 359; while the abuse of Sarah S. "occurred inside her home or in the bedroom of her Florida residence . . . when no other person was present to observe the defendant's behavior." Id.

toward the other victims. Assuming that this court correctly held in *Ellis* that the joinder of the cases was improper because the evidence of the defendant's misconduct toward Sarah S. was unduly prejudicial, however, the disparity between the charged conduct and the uncharged misconduct in the present case is, in my view, not nearly as great as the disparity in *Ellis*. In *Ellis*, "[t]he abuse of Sarah S. resulted in a ten count information that included one count of attempted sexual assault in the first degree. The abuse of Julia S. and Kristin C. resulted in a three count and four count information, respectively, neither of which included a charge of attempted sexual assault in the first degree." Id., 360. In the present matter, the defendant was charged with a single violation of General Statutes § 53a-73a (a) (5) in all three cases.[7] Accordingly, I do not believe that the consolidation of the cases was unduly prejudicial in the cases involving D and J because the misconduct involving M was more egregious.

The majority also suggests that the joinder of the cases was improper because "the jury may have cumulated the evidence from all of the cases to find the defendant guilty in J's and M's cases." (Internal quotation marks omitted.) Again, I disagree. There was nothing about the evidence in the three cases that was inherently confusing or that made it difficult for the jury to distinguish them. Moreover, the trial court instructed the jury that, to convict the defendant under § 53a-73a (a) (5), the state was required to prove beyond a reasonable doubt in each separate case that the defendant had intentionally engaged in sexual contact with

---

[7] In the case involving M, the defendant also was charged with sexual assault in the fourth degree under § 53a-73a (a) (2). That charge, however, was a charge in the alternative, in the event that the jury determined that the defendant had not made a false representation that the sexual contact was for a bona fide medical purpose. It was not an additional or more serious charge.

the victims and had falsely represented that the sexual contact was for a bona fide medical procedure.[8] It also instructed the jury repeatedly that it was required to consider the merits of each case separately.[9] I believe that these instructions, the language of which the majority ignores, adequately informed the jury that it could not convict the defendant in one case solely on the basis of evidence presented in another case.

In support of its conclusion to the contrary, the majority quotes the portion of the Appellate Court's opinion stating that "[t]he insufficiency of the court's repeated admonitions against cumulating the cases became obvious during the foreperson's reading of the verdict. When asked if the jury found the defendant guilty in the first case, the foreperson replied, 'guilty.' Next, the court clerk asked whether the jury had found the defendant

---

[8] The trial court instructed the jury that the state "must prove each element of the offense charge[d] beyond a reasonable doubt before you return a guilty verdict on a charge. The fact that there are three separate informations here does not mean that the state has a lesser standard or a lesser burden of proof with respect to any of the four charges contained in the three informations."

[9] The trial court instructed the jury that it "must infer nothing from [the consolidation of the cases]. It is essentially for the purpose of judicial efficiency and nothing more. It is of the utmost importance that you keep each alleged incident separate and distinct from one another. You must keep them separate in your evaluation of the facts and separate in your minds, and the determination of your verdict. You must not mix the evidence of one incident with the evidence of another."

The trial court further instructed the jury that "[t]he prosecution's case is not improved or any stronger because there are cases that are tried together in one trial as this one. To judge how good a prosecutor's case is by the number of incidents that are claimed without analyzing each incident separately is not in accord with our system of government.

"This court is mindful of the natural tendency to conclude that a person must be guilty of one or more of the consolidated matters because there are so many. One or more of you think that the total overall effect of each offense may indicate that [the defendant] is guilty as to some or all of the offenses. And if you think this way you have merged the offense[s] and you have fallen prey to exactly what you must not do. You must render a verdict of guilty or not guilty on each of the four counts separately."

guilty in the second case, and the foreperson replied, 'I am not sure I understand that. Are we separating the three girls?' " *State* v. *Gupta*, 105 Conn. App. 237, 249–50, 937 A.2d 746 (2008). It is apparent, however, that both the Appellate Court and the majority have misread the record. The court clerk first asked the jury whether it had found the defendant guilty in the case involving J with Docket No. CR-04-33225. The clerk then asked the jury whether, in the case involving D with Docket No. CR-04-34202, it had found the defendant guilty for the crime "for which he stands charged in the second *count*." (Emphasis added.) Because the information involving D had only one count, the foreperson's response, "[a]re we separating the three girls?" indicated that she was confused by the clerk's misstatement suggesting that either the information against D had two counts or that the crime involving D was the second count of the case involving J. The response did not indicate that she believed that the cases were not separate. Accordingly, there is nothing in the record to support the majority's conclusion that the jury was confused or that it ignored the trial courts forceful and repeated instructions that it must consider the three cases separately. I decline simply to assume that the jury ignored or disobeyed the court's instructions.

The majority also suggests that consolidation of the cases was improper because, unlike in the cases involving J and D, the defendant could not claim in the case involving M that the alleged misconduct was a bona fide medical procedure. Rather, the only defense that he was able to raise in the case involving M was that she had lied about his misconduct toward her. The majority has cited no authority, however, for the proposition that cases may not be consolidated for trial if the defendant has raised different defenses in the separate cases. As I have indicated, in determining whether evidence of uncharged misconduct is cross admissible,

"the trial court neither weighs credibility nor makes a finding that the [g]overnment has proved the conditional fact by a preponderance of the evidence. The court simply examines all the evidence in the case and decides whether *the jury* could reasonably find the conditional fact . . . by a preponderance of the evidence." (Emphasis in original; internal quotation marks omitted.) *State* v. *Aaron L.*, supra, 272 Conn. 822. Thus, if a jury reasonably could find that M had *not* lied, the evidence in that case would be cross admissible in the cases involving D and J. It is clear to me that the jury reasonably could have found that M was telling the truth. Indeed, the majority does not contend to the contrary. Accordingly, I would conclude that the defendant has failed to meet his "heavy burden of showing that the denial of severance resulted in substantial injustice"; (internal quotation marks omitted) *State* v. *Herring*, supra, 210 Conn. 95; and that the trial court did not abuse its broad discretion in consolidating the cases.

Finally, even if I agreed with the majority that the trial court abused its discretion in consolidating the cases, I would conclude that any such error was harmless—an issue that the majority fails to consider. J testified at trial that the defendant was "kneading" and "massaging" her breasts with both hands during his examination of her and that he "always ran his thumbs over the top." She demonstrated his actions on a mannequin. M testified that the defendant was "groping" and "massaging" her breasts with both hands and also demonstrated his actions on the mannequin. The state's expert witness, Thomas Godar, a physician specializing in pulmonary medicine, testified that, in performing a routine pulmonary examination, it might be necessary to touch the patient's breasts with a stethoscope, but placing a hand on the breast would not be necessary. He also testified unequivocally that, if a patient presented with the symptoms and complaints of each of

the victims, it would be unnecessary for a physician to manipulate the patient's breasts. He further testified that, after reviewing the medical records of the defendant's treatment of D and J, it was his opinion that neither patient required a breast examination. In addition, he testified that there is no standard medical procedure that requires a physician to massage both of the patient's breasts simultaneously with both hands. During cross-examination of the defendant's expert witness, Francoise Roux, a pulmonologist, the prosecutor demonstrated the massaging technique on the mannequin and, without any objection by the defendant, asked Roux if the technique constituted a normal pulmonary examination or a normal breast examination. Roux testified that it did not.

As the majority acknowledges, the defendant's defense in the case involving J was that she had "misinterpreted the defendant's legitimate examination," not that she had lied. Accordingly, I do not believe that the evidence in the case involving M could have prejudiced the jury in the case involving J. If the jury believed J's testimony—and she had no apparent motive to lie—there is no reasonable possibility that, if the evidence in the case involving M had not been before the jury, the jury would have acquitted the defendant in that case. The defendant's own expert witness admitted that the defendant's conduct, as described by J, did not constitute a bona fide medical procedure. In addition, even if the majority is correct that the evidence of the misconduct in the case involving J was significantly less egregious than the evidence of the misconduct in the case involving M, I cannot perceive how the cross admission of evidence of this similar but *less* serious misconduct could have been unduly prejudicial in that case. Accordingly, I would conclude that the consolidation of the cases, even if improper, was harmless.

I next turn to the majority's conclusion that the trial court improperly excluded evidence of the videotapes demonstrating the proper technique for a pulmonary examination. I agree that the exclusion of the videotapes was improper, but I would conclude that it was harmless. "When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the [impropriety] was harmful. . . . [A] nonconstitutional [impropriety] is harmless when an appellate court has a fair assurance that the [impropriety] did not substantially affect the verdict." (Citation omitted; internal quotation marks omitted.) *State* v. *Orr*, 291 Conn. 642, 663, 969 A.2d 750 (2009).

As I have indicated, there was extremely strong evidence that the defendant's conduct toward the victims did not constitute a bona fide medical procedure. Indeed, the defendant's own expert witness admitted that the simultaneous massaging of both of a patient's breasts in the manner demonstrated by M and J was not a proper examination technique. Thus, the central issue in the cases involving M and J was the credibility of their testimony, not the credibility of Roux' testimony regarding the proper technique for a pulmonary examination, which the videotapes were intended to bolster.

Second, a thorough review of the videotapes reflects that virtually all of the relevant information in the videotapes was contained in the excerpts from the twelve treatises that were read into the record, which tended to corroborate Roux' testimony. Accordingly, although the videotapes were probative, their probative value was only incrementally significant because the evidence was cumulative. Accordingly, I believe that there is "a fair assurance that [the exclusion of the videotapes] did not substantially affect the verdict." (Internal quotation marks omitted.) Id.

I would conclude that the trial court did not abuse its broad discretion in consolidating the three cases for

trial and that any impropriety in excluding the video-
tapes from evidence was harmless. Accordingly, I would
reverse the judgment of the Appellate Court and remand
the case to that court with direction to affirm the judg-
ment of conviction.

---

* The listing of justices reflects their seniority status on this court as of
the date of oral argument.