# STATE OF CONNECTICUT *v.* MARVIN R. WILSON
## (AC 34089)

Gruendel, Sheldon and Schaller, Js.

Argued February 5—officially released May 21, 2013

*Adele V. Patterson,* senior assistant public defender, for the appellant (defendant).

*Sarah Hanna,* assistant state's attorney, with whom, on the brief, were *Michael Dearington,* state's attorney, *Marc G. Ramia,* senior assistant state's attorney, and *Jennifer Lindade,* deputy assistant state's attorney, for the appellee (state).

*Opinion*

GRUENDEL, J. The defendant, Marvin R. Wilson, appeals from the judgments of conviction, rendered after a jury trial, in docket number CR-10-00107596, of strangulation in the second degree in violation of General Statutes § 53a-64bb[1] and, in docket number CR-11-0117455, of criminal violation of a protective order in contravention of General Statutes § 53a-223.[2] On appeal, the defendant claims that the court abused its discretion in consolidating the cases for trial. We affirm the judgments of the trial court.

The jury reasonably could have found the following facts. The defendant met the victim, Colleen Gambino, at a Narcotics Anonymous meeting in 2008. Although married, the victim began dating the defendant approximately four months later and moved in with him in October, 2008. She subsequently moved back in with her husband for a period of time before once again moving in with the defendant. The defendant and the victim later moved into the attic apartment of a three-family house located at 102 Gilbert Street in New Haven on March 7, 2010.

---

[1] General Statutes § 53a-64bb (a) provides: "A person is guilty of strangulation in the second degree when such person restrains another person by the neck or throat with the intent to impede the ability of such other person to breathe or restrict blood circulation of such other person and such person impedes the ability of such other person to breathe or restricts blood circulation of such other person."

[2] General Statutes § 53a-223 (a) provides: "A person is guilty of criminal violation of a protective order when an order issued pursuant to subsection (e) of section 46b-38c, or section 54-1k or 54-82r has been issued against such person, and such person violates such order."

The victim was sleeping in bed on the morning of July 12, 2010, when the defendant suddenly shook her. As she awoke, the defendant asked her to call her aunt in Florida "for money." The victim pretended to call her aunt with the defendant's cell phone and informed him that her aunt had not answered. When the defendant examined the phone and learned that she had not called her aunt, he became angry and repeatedly called the victim a liar. The victim then informed the defendant that she "wasn't calling nobody for money," which made the defendant "real mad." At that time, the victim also declared, "I'm not sure if I even want to be with you anymore."

In response, the defendant jumped from a chair and angrily approached the victim. He climbed on top of the victim, who was lying in bed, and began choking her. The defendant placed his hands around her neck and squeezed hard. As a result, the victim felt pain in her neck and was unable to breathe or speak. As he choked her, the victim "was real scared" as to whether she "was going to make it out of there." The defendant eventually relented and let go of the victim's throat. He returned to the chair in the room and tore up a birthday card he had bought the victim. As he did, he appeared to be "[o]ut of his mind." His anger escalated, and when the victim informed him that she was going to contact the police, the defendant forcefully placed a pillow over her face and attempted to smother her. When the victim began kicking a nearby wall, the defendant removed the pillow from her face and "grabbed a knife and said that he was going to stab himself because [the victim] told him [she] was going to have him arrested . . . . [H]e said he was going to stab himself and then say that [the victim] did it to him." The defendant then spoke with someone on his cell phone and said, "she's having me arrested, take care of her."

The two continued to argue as the victim proceeded first to the kitchen and then to a staircase, where the victim "fell and cut both of [her] arms." Two young girls who also lived in the house approached the victim and the defendant and stated that they were going to call the police because "[t]hey heard the whole thing." In response, the defendant told the girls not to listen to the victim because "she's not on her medication . . . ."

The victim departed the residence and proceeded to the emergency room of the Hospital of Saint Raphael in New Haven, where she placed a 911 call. New Haven police Officer Leslee Witcher responded to the call. When she first encountered the victim, the victim was "very upset. She was shaking. She was crying. She was hysterical." Witcher observed a laceration on the victim's right forearm, bruising around the neck area and blotches on her cheeks. The victim remained in pain at that point, as her "neck was killing. My arm was hurting me. I felt light-headed." After calming her, Witcher took a statement from the victim.

As she sat with the victim, the defendant suddenly entered the hospital. The victim immediately began to tremble and identified him to Witcher as her attacker. At that time, the defendant was arrested.

The victim subsequently was transported to the New Haven police station, where she provided an audio statement to Detective Tammi Means and photographs were taken of her wounds. The photographs depict fresh marks on the victim's neck and cheeks below her eyes. The victim testified at trial that the bruises on her neck were painful and turned black and blue in the days following the attack. In addition, Asim Tarabar, a physician at Yale-New Haven Hospital, testified that the marks on the victim's cheeks were called petechiae, which "look . . . like small bruises" and are "common on the upper part of your neck and the face and usually

around your eyes, and if it is really severe strangulation the white part of your eye called conjunctiva you can see a bleeding there, as well." Tarabar explained that petechiae are "small bleeding in around your eyes or around your conjunctivas or upper part of your face and it's resulting just because of increase of blood flow coming from your back small arteries in your neck and not be able to . . . get rid of the excess of the blood because at the same time when you are compressing someone's neck you are compressing three types of structures, one, incoming vessels that are bringing blood to outcoming vessels. . . . [I]f you apply enough pressure you compromise airways so there is no oxygen coming to your lungs."

Following the defendant's arrest, a protective order issued on July 13, 2010. That order named the victim as the "[p]rotected [p]erson" and the defendant as the respondent. It provided in relevant part that the defendant must "not contact the protected person in any manner, including by written, electronic or telephone contact . . . ."

Despite the existence of that protective order, the defendant stipulated at trial that "[t]here were multiple phone calls made by [him] to [the victim] from the Bridgeport Correctional Facility while the protective order was in effect." In one telephone conversation, the defendant asked the victim to recant her statement. The victim did exactly that at the defendant's October 22, 2010 court proceeding, stating in relevant part that "I falsely had [the defendant] arrested, and I'm here to confess that I filed a false report to the court. . . . He didn't violate his protective order because he hasn't spoken to me." Despite the victim's recantation, the court declined to modify the protective order. The victim testified at trial that she made that recantation at the behest of the defendant because, at the time, she still loved him and did not want him to go to jail.

When the victim made no further efforts to recant her allegations, the defendant sent her a threatening letter. That handwritten letter was admitted into evidence at trial and reads in relevant part: "I was wondering what made you tell all that shit and come to court and say all that shit. . . . [L]ook I mean it. See I say this is not going to end well. See I told my friend what you did and he promise me he would handle it. So I'm not worrying you so fuck up my life. Why didn't you do this to [your husband] is that who you waiting on. That's why you doing this. Don't fucking act like you didn't do anything wrong. . . . I'm having my friend from Hartford come down. . . . Right now my only hope is to put you on the stand [and] bring out all the time you have lied and all [the] deep dark secret in your closet to get a juror to not see [you] as miss white innocence hurt by black man. Some advice stop getting in cars with strangers. The next time who knows who it could be. . . . You need to call someone and say you change it back to what you said in [the] October [22, 2010 court proceeding]. . . . Why you think this case been going on for so long. They was waiting for you. . . . [D]o you think in the long run it's going to be worth it. Cause if it come down to me or you you going away. . . . No matter what has to be done to help me it will be done. . . . [Y]ou are my enemy and no matter what has to be done to stop [an] enemy will be done. . . . The next time I see or hear from you will be at my trial. More shit is coming out than you think. I have to use everything I have. Like I said my aunt had a P.I. on you for about three months. . . . Do you remember I kept saying to you I know more than you think. Okay got to go have no more time for you. Let see how this ends shall we." Upon receiving that letter on March 19, 2011, the victim contacted the police and the defendant again was arrested.

On June 27, 2011, the state filed a long form information in docket number CR-10-00107596 that charged

the defendant with strangulation in the first degree in violation of General Statutes § 53a-64aa. The state also filed a long form information in docket number CR-11-0117455 that charged the defendant with criminal violation of a protective order in violation of § 53a-223 and tampering with a witness in violation of General Statutes § 53a-151. On June 30, 2011, the state filed a motion for joinder of the two informations. That motion averred that (1) "[b]oth informations involve the same defendant and the same complainant"; (2) "[t]he evidence and testimony that would be presented in one trial would be relevant, material, and admissible in the other"; and (3) "[t]he allegations regarding the [v]iolation of the [p]rotective [o]rder and [t]ampering with a witness are directly related to the allegation related to the [s]trangulation case." The defendant filed a written objection to that motion. After hearing argument from the parties on June 30, 2011, the court granted the motion and the cases were consolidated.

A jury trial followed, at the conclusion of which the jury found the defendant guilty in docket number CR-10-00107596 of the lesser included offense of strangulation in the second degree. With respect to docket number CR-11-0117455, the jury found the defendant guilty of violating a protective order; it acquitted him on the tampering with a witness charge. The court rendered judgments accordingly and sentenced the defendant to a total effective term of six years incarceration, followed by four years of special parole. This appeal followed.

On appeal, the defendant claims that the court improperly consolidated the two cases. "A joint trial expedites the administration of justice, reduces the congestion of trial dockets, conserves judicial time, lessens the burden upon citizens who must sacrifice both time and money to serve upon juries, and avoids the necessity of recalling witnesses who would otherwise be

called to testify only once." (Internal quotation marks omitted.) *State* v. *Booth*, 250 Conn. 611, 622, 737 A.2d 404 (1999), cert. denied sub nom. *Brown* v. *Connecticut*, 529 U.S. 1060, 120 S. Ct. 1568, 146 L. Ed. 2d 471 (2000). "The trial court has broad discretion in ordering the joinder of offenses and such an order will not be disturbed unless the court's discretion has been manifestly abused." (Internal quotation marks omitted.) *State* v. *Greene*, 209 Conn. 458, 463, 551 A.2d 1231 (1988). "[A] trial court's ruling on a motion for joinder of multiple informations for trial implicates Practice Book § 41-19 . . . . Practice Book § 41-19 provides that [t]he judicial authority may, upon its own motion or the motion of any party, order that two or more informations, whether against the same defendant or different defendants, be tried together." (Internal quotation marks omitted.) *State* v. *LaFleur*, 307 Conn. 115, 154–55, 51 A.3d 1048 (2012).

At trial, the burden rests with the state to prove that joinder will not substantially prejudice a defendant. As our Supreme Court recently clarified, "when charges are set forth in separate informations, presumably because they are not of the same character, and the state has moved in the trial court to join the multiple informations for trial, the state bears the burden of proving that the defendant will not be substantially prejudiced by joinder pursuant to Practice Book § 41-19. The state may satisfy this burden by proving, by a preponderance of the evidence, either that the evidence in the cases is cross admissible or that the defendant will not be unfairly prejudiced pursuant to the *Boscarino* factors."[3] *State* v. *Payne*, 303 Conn. 538, 549–50, 34

---

[3] See *State* v. *Boscarino*, 204 Conn. 714, 720–24, 529 A.2d 1260 (1987). "The *Boscarino* factors are (1) whether the charges involve discrete, easily distinguishable factual scenarios; (2) whether the crimes were of a violent nature or concerned brutal or shocking conduct on the defendant's part; and (3) the duration and complexity of the trial." (Internal quotation marks omitted.) *State* v. *Fana*, 109 Conn. App. 797, 803–804, 953 A.2d 898, cert. denied, 289 Conn. 936, 958 A.2d 1246 (2008).

A.3d 370 (2012). On appeal, the burden rests with the defendant to "show that joinder was improper by proving substantial prejudice that could not be cured by the trial court's instructions to the jury . . . ." (Internal quotation marks omitted.) *State* v. *LaFleur*, supra, 307 Conn. 158.

I

"A long line of cases establishes that the paramount concern is whether the defendant's right to a fair trial will be impaired. Therefore, in considering whether joinder is proper, [the] court has recognized that, where evidence of one incident would be admissible at the trial of the other incident, separate trials would provide the defendant no significant benefit. . . . Under such circumstances, the defendant would not ordinarily be substantially prejudiced by joinder of the offenses for a single trial. . . . Accordingly, we have found joinder to be proper where the evidence of other crimes or uncharged misconduct [was] cross admissible at separate trials." (Citations omitted; internal quotation marks omitted.) Id., 155.

The state submits, and we agree, that the evidence in each case was cross admissible.[4] The evidence submitted to substantiate the state's case in docket number CR-11-0117455 was relevant to demonstrate the defendant's consciousness of guilt in the strangulation case. In particular, the jury could have found, from evidence adduced at trial indicating that the defendant made telephone calls to the victim directing her to recant her prior allegations and sent her the threatening letter, that the defendant attempted to influence the victim's

[4] The defendant, in his reply brief, alleges that "the trial prosecutor did not seek joinder on the basis that the evidence in both cases is cross admissible . . . ." He is mistaken. The June 30, 2011 motion for joinder filed by the state specifically averred that "[t]he evidence and testimony that would be presented in one trial would be relevant, material, and admissible in the other."

testimony against him. "[E]vidence of threats against witnesses is generally admissible . . . on the theory that the making of such threats evinces a consciousness of guilt." (Internal quotation marks omitted.) *State* v. *Robertson*, 254 Conn. 739, 756, 760 A.2d 82 (2000).

In addition, the evidence in the strangulation case was relevant to the state's case in docket number CR-11-0117455. Although "[e]vidence of other crimes, wrongs or acts of a person is inadmissible to prove the bad character or criminal tendencies of that person"; Conn. Code Evid. § 4-5 (a); "[e]vidence of other crimes, wrongs or acts of a person is admissible . . . to prove intent, identity, malice, motive . . . ." Conn. Code Evid. § 4-5 (b). The jury reasonably could have found the evidence that the defendant previously had strangled the victim indicative of both his malice toward her and his motive for violating the protective order and allegedly tampering with a witness. See *State* v. *Rosado*, 107 Conn. App. 517, 530, 945 A.2d 1028, cert. denied, 287 Conn. 919, 951 A.2d 571 (2008). Because the evidence in the two cases was cross admissible, we cannot say that the court abused its discretion in granting the motion for joinder.

## II

Even if we were to conclude that the evidence was not cross admissible, the defendant could not prevail. To do so, the defendant must demonstrate "that joinder was improper by proving substantial prejudice that could not be cured by the court's instructions to the jury." (Internal quotation marks omitted.) *State* v. *LaFleur*, supra, 307 Conn. 158. He has not done so.

### A

Preliminarily, we note that the defendant cannot establish the requisite harm with respect to either of the offenses charged in docket number CR-11-0117455.

It is undisputed that the defendant was acquitted of the tampering with a witness charge. It further is undisputed that the defendant stipulated that he contacted the victim by telephone on numerous occasions while the protective order was in effect, a plain violation thereof. Accordingly, he cannot show that he was substantially prejudiced by the joinder of the cases with respect to the charged offenses in docket number CR-11-0117455.

B

The remaining question is whether the defendant was substantially prejudiced with respect to the strangulation charge set forth in docket number CR-10-00107596. That analysis entails consideration of the *Boscarino* factors. See footnote 3 of this opinion.

Applying those factors, we conclude that the defendant cannot establish that he was prejudiced by the joinder of the two cases. First, the charges consolidated for trial involved discrete, easily distinguishable factual scenarios. The strangulation charge was predicated on the physical attack of the victim in the attic apartment on the morning of July 12, 2010. The protective order and tampering charges arose from the defendant's conduct in subsequent months when he repeatedly telephoned the victim from the correctional facility and sent her the threatening letter on March 18, 2011.[5] Second, the conduct underlying the charged offenses in docket number CR-11-0117455 "was not so brutal or shocking as to create a substantial risk that the jury, with explicit instructions to treat each offense separately, would nevertheless treat the evidence cumulatively." *State* v. *Yopp*, 35 Conn. App. 740, 753, 646 A.2d

---

[5] The letter and its envelope were admitted into evidence as state's exhibit 11. The envelope bears a postal stamp date of March 18, 2011, and the victim at trial testified that she received that letter the following day.

298 (1994). "Whether one or more offenses involve brutal or shocking conduct likely to arouse the passions of the jurors must be ascertained by comparing the relative levels of violence used to perpetrate the offenses charged in each information." *State* v. *Davis*, 286 Conn. 17, 29–30, 942 A.2d 373 (2008). We already have concluded that the defendant cannot demonstrate prejudice with respect to the protective order and tampering charges. The conduct involved in those charges, while serious, is nowhere near as brutal or shocking as the act of placing one's hands around the throat of another and squeezing so hard that the victim cannot speak or breathe. Third, the trial, which consisted of only two days of evidence, eight witnesses and thirteen exhibits, was not so long or complex as to require severance.

In addition, the record discloses that the trial court repeatedly cautioned the jury to consider each charge separately in reaching its verdict. "[A]lthough a curative instruction is not inevitably sufficient to overcome the prejudicial impact of [inadmissible other crimes] evidence . . . where the likelihood of prejudice is not overwhelming, such curative instructions may tip the balance in favor of a finding that the defendant's right to a fair trial has been preserved." (Citations omitted; internal quotation marks omitted.) *State* v. *Jennings*, 216 Conn. 647, 660, 583 A.2d 915 (1990); see also *State* v. *Gupta*, 297 Conn. 211, 223, 998 A.2d 1085 (2010) ("[t]he defendant bears a heavy burden of showing that . . . any resulting prejudice [of joinder] was beyond the curative power of the court's instructions" [internal quotation marks omitted]). In light of the foregoing, the court did not abuse its discretion in consolidating the two cases for trial.

The judgments are affirmed.

In this opinion the other judges concurred.