******************************************************

The ''officially released'' date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the ''officially released'' date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************************

STATE OF CONNECTICUT *v.*
ULYSES R. ALVAREZ
(AC 43506)

Bright, C. J., and Suarez and Sullivan, Js.

*Syllabus*

Convicted of two counts of the crime of sexual assault in the fourth degree and two counts of the crime of risk of injury to a child, the defendant appealed to this court. The defendant's conviction stemmed from his alleged sexual abuse of the minor victim, K, who was a resident of the rehabilitation facility where the defendant was employed. Before trial, the court granted the state's motion to allow the introduction of uncharged misconduct evidence, specifically, evidence regarding the defendant's sexual abuse of A, another resident of the rehabilitation facility, and P, a woman the defendant allegedly had assaulted while he was employed as a police officer. Prior to trial, both the state and defense counsel subpoenaed records pertaining to K and A from, inter alia, the Department of Children and Families and various mental health facilities that had treated K and A. The court conducted an in camera review of these records for exculpatory material and released certain unspecified records to the parties; the rest of the records remained under seal. *Held*:

1. The trial court abused its discretion in keeping certain confidential records under seal and by not taking the steps required by *State* v. *Esposito* (192 Conn. 166) to disclose those records to the parties: several of the sealed records not disclosed to the defendant contained references to A's credibility and capacity for truthfulness, and the defendant did not have access to this information about A from another source; moreover, the court's failure to disclose these records was not harmless, as, although the state relied on evidence other than A's testimony to corroborate K's testimony, there was little physical evidence that corroborated K's allegations, A was the only witness who testified at trial to seeing the defendant act in an inappropriate manner toward K, the prosecutor focused a significant portion of her closing argument on A's testimony, and defense counsel's probe of A's credibility during cross-examination might not have been adequate in light of the court's failure to disclose the records; accordingly, the defendant was entitled to a new trial at which A could testify only if she waived her privilege to the relevant sealed records.

2. The trial court erred in admitting uncharged misconduct evidence relating to P as propensity evidence pursuant to § 4-5 (b) of the Connecticut Code of Evidence; the defendant's uncharged misconduct toward P was not sufficiently similar to the charged conduct involving K to be admissible at trial, as the frequency and the severity of the assaults were different, with the defendant's conduct toward K occurring multiple times over a period of two months and his interaction with P happening once, the position of authority he held over K, who was a resident at a facility where the defendant was an employee, and P, who interacted with the defendant in her own home, was different, and the locations of the assaults were materially different, with the defendant's assaults on K occurring in a facility with a risk of detection and his alleged assault of P occurring while they were alone in her home, and the few similarities between the charged and uncharged misconduct provided an insufficient basis to render the uncharged conduct admissible.

Argued September 7—officially released December 14, 2021

*Procedural History*

Substitute information charging the defendant with two counts each of the crimes of sexual assault in the fourth degree and risk of injury to a child, brought to the Superior Court in the judicial district of Litchfield, where the court, *Wu, J.*, granted the state's motion to

introduce uncharged misconduct evidence and denied the defendant's motion in limine to introduce certain evidence; thereafter, the matter was tried to the jury before *Wu, J.*; verdict and judgment of guilty, from which the defendant appealed to this court. *Reversed*; *new trial.*

*Norman A. Pattis*, for the appellant (defendant).

*Samantha L. Oden*, former deputy assistant state's attorney, with whom, on the brief, were *Dawn Gallo*, state's attorney, and *Jessica Gouveia*, deputy assistant state's attorney, for the appellee (state).

*Opinion*

BRIGHT, C. J. The defendant, Ulyses R. Alvarez, appeals from the judgment of conviction, rendered by the court following a jury trial, of sexual assault in the fourth degree in violation of General Statutes § 53a-73a (a) (1) (E) and (8), and risk of injury to a child in violation of General Statutes § 53-21 (a) (1) and (2). On appeal, the defendant claims that the trial court abused its discretion by (1) allowing the state to introduce evidence of uncharged misconduct, (2) withholding relevant sealed records from the defendant, and (3) barring defense counsel from inquiring into the sexual history of the complaining witness, K.[1] We agree with the defendant's second claim and, accordingly, reverse the judgment of the trial court and remand the case for a new trial. We also address the defendant's first claim because the issues underlying the claim are likely to arise on remand.[2]

The following facts, which the jury heard, and procedural history are relevant to our resolution of the defendant's claims. From January to April, 2017, K, a fifteen year old girl, resided at Touchstone, a residential rehabilitation facility for at risk girls. During this same time period, the defendant was employed by Touchstone as an adolescent development specialist and was responsible for the general welfare and care of Touchstone's residents.

At trial, K testified to the following. In February, 2017, the defendant began acting inappropriately toward her. During her first week at Touchstone, the defendant looked K up and down, an act she described as "how guys normally check females out." A few days later, he blew K a kiss when the two passed on the stairs.

A couple of weeks later, when K was by herself in one of Touchstone's common rooms and the defendant was sitting in a chair facing the entryway to the room, he told K to masturbate in front of him. K did so, and, while she was masturbating, the defendant used signals to direct her movements. If his legs were up and resting on the wall, that was a sign that K should continue masturbating. If he lowered his legs, that indicated to K to stop. Additionally, when the defendant placed his hand inside of the cuff of his pants, that meant that he wanted K "to go inside [of her] underwear," and when he rubbed the top of his pants, that indicated to K to masturbate "outside of [her] pants."

K testified that the defendant had her masturbate for him at least nine more times. During some of those incidents, he showed K pictures on his phone of sexual positions and asked her to pose similarly. On one occasion, the defendant gestured for K to masturbate and then wipe her vaginal fluid on his hand. K complied, and the defendant licked his hand. On two occasions, she masturbated for him in her bedroom and without

any pants on.

K further testified that the defendant's actions toward her did not stop at masturbation. He commented on her body, told her that she had a "nice butt," and mentioned that he wanted her to wear leggings around him. He also showed K a picture of his naked back and back tattoo and made sexual gestures to her, including putting his index finger and middle finger in a "V" shape underneath his mouth and then sticking his tongue through the "V," which K understood as a reference to oral sex. At one point, the defendant gave K a note telling her that he wanted to have sex with her. He also showed K notes in his phone that said, "I want to fuck you so bad" and "lick, lick."

K testified that, on one occasion, the defendant took her and some other residents to Walmart. During the ride, he held K's hand. After the group returned to Touchstone, the defendant reached for his backpack, which was at K's feet, and, in the process, slid his hand along K's inner thighs, almost up to her vagina. Then, when K got out of the car, he asked her to put a bag into his car. As she did so, he touched and gripped her buttocks.

A, another Touchstone resident, testified at the defendant's trial. During her testimony, A stated that K told her that the defendant asked K to masturbate for him multiple times and generally had been acting inappropriately toward her. A further stated that she saw the defendant and K holding hands during the Walmart trip and previously had seen the defendant blow kisses at K. A also testified that the defendant had behaved inappropriately toward her. According to A, the defendant told her that she had the body of a twenty-four year old, repeatedly winked at her, and made sexual gestures at her. A further stated that the defendant often had an erection when he interacted with her and once said that he wished she could help him with his erection. A also testified that the defendant told her that he wanted to have sex with her and that he wanted to see her outside of the program.

On February 14, 2017, a Touchstone resident reported the defendant to a Touchstone employee for behaving inappropriately toward K, and an investigation was initiated, but K denied the allegations. Then, on April 12, 2017, when K was in the dining hall, she saw the defendant looking at another resident "the same way he looked at [her]." K became upset and started yelling at him. One of Touchstone's supervisors, Kristen Fracasso-Kersten, heard the noise and came downstairs to find K screaming, crying, and hyperventilating. Fracasso-Kersten then sent K to speak with Christina Borel, Touchstone's clinical director. While talking with Borel, K disclosed what the defendant had done to her. Fracasso-Kersten later reviewed Touchstone's surveillance video and saw footage of the defendant signaling with

his legs in the manner K had described.

At trial, Detective Paul Lukienchuk of the Connecticut State Police testified about his efforts to serve a search warrant on the defendant. The warrant authorized Detective Lukienchuk to collect the defendant's phone. When he attempted to execute the warrant, the defendant tried to hide his cell phone by slipping it into his mother's purse. Detective Lukienchuk eventually was able to obtain the phone and review its contents. On the phone, he found pictures of the defendant's back and back tattoos, a picture of the defendant making the "V" sign that K had described, and a message containing the words "lick, lick."

On the basis of this evidence, a jury found the defendant guilty of two counts of sexual assault in the fourth degree and two counts of risk of injury to a child. The court accepted the jury's verdict and sentenced the defendant to a total effective term of imprisonment of nineteen years, execution suspended after five years, with twenty-five years of probation and a $1000 fine. Additional facts and procedural history will be set forth below as necessary.

I

The defendant claims that the court abused its discretion by failing to disclose certain confidential records related to K and A, in violation of his constitutional right to confrontation.[3] We agree.

The following additional facts and procedural history are necessary to our resolution of this claim. Prior to trial, on the basis of an agreement between the parties, the state subpoenaed records related to K and A from the Department of Children and Families (department) and juvenile court, and defense counsel subpoenaed records from several hospitals and mental health facilities that had treated K and A. These records were provided to the court under seal, and the court reviewed the records in camera. Certain unspecified department records were then released to the parties.[4] The rest of the records, none of which were released, remained under seal. These sealed records were later made part of the appellate record, and we, at the defendant's request, conducted our own in camera review of the sealed records to determine whether they contain information related to the credibility and truthfulness of K and A.

"A criminal defendant has a constitutional right to cross-examine the state's witnesses, which may include impeaching or discrediting them by attempting to reveal to the jury the witnesses' biases, prejudices or ulterior motives, or facts bearing on the witnesses' reliability, credibility, or sense of perception." *State* v. *Slimskey*, 257 Conn. 842, 853, 779 A.2d 723 (2001). Thus, in certain instances, a witness' right to keep certain records confidential must give way to a defendant's constitutional right to confrontation. See id., 853–84. Our Supreme

Court has set forth a procedure to be used by trial courts when these two rights potentially come into conflict. "If, for the purposes of cross-examination, a defendant believes that certain privileged records would disclose information especially probative of a witness' ability to comprehend, know or correctly relate the truth, he may, out of the jury's presence, attempt to make a preliminary showing that there is a reasonable ground to believe that the failure to produce the records would likely impair his right to impeach the witness. . . . If in the trial court's judgment the defendant successfully makes this showing, the state must then obtain the witness' permission for the court to inspect the records in camera. . . . Upon inspecting the records in camera, the trial court must determine whether the records are especially probative of the witness' capacity to relate the truth or to observe, recollect and narrate relevant occurrences. . . . If the court discovers no probative and impeaching material, the entire record of the proceeding must be sealed and preserved for possible appellate review." (Internal quotation marks omitted.) *State* v. *McMurray*, 217 Conn. 243, 257, 585 A.2d 677 (1991); see also *State* v. *Esposito*, 192 Conn. 166, 179–80, 471 A.2d 949 (1984) (setting forth procedure by which confidential records can be disclosed to parties); but see *State* v. *Pierson*, 201 Conn. 211, 228, 514 A.2d 724 (1986) (modifying procedure established in *Esposito*).

Thereafter, on appeal, when so requested by the parties, this court "has the responsibility to conduct its own in camera review of the sealed records to determine whether the trial court abused its discretion in refusing to release those records to the defendant." (Internal quotation marks omitted.) *State* v. *Gainey*, 76 Conn. App. 155, 158, 818 A.2d 859 (2003). "The linchpin of the determination of the defendant's access to the records is whether they sufficiently disclose material especially probative of the [witness'] ability to comprehend, know and correctly relate the truth . . . so as to justify breach of their confidentiality and disclosing them to the defendant in order to protect his right of confrontation." (Citation omitted; internal quotation marks omitted.) *State* v. *Storlazzi*, 191 Conn. 453, 459, 464 A.2d 829 (1983). The determination of a defendant's access to confidential records lies in the sound discretion of the trial court, and we will not disturb that discretion unless it is abused. See *State* v. *McMurray*, supra, 217 Conn. 257; see also *State* v. *Slimskey*, supra, 257 Conn. 856 ("[a]ccess to confidential records should be left to the discretion of the trial court which is better able to assess the probative value of such evidence as it relates to the particular case before it . . . and to weigh that value against the interest in confidentiality of the records" (internal quotation marks omitted)).

Following a thorough in camera review of the subject records, we conclude that the court should have disclosed several of the sealed records to the parties.

Although none of the records contains any references to K's credibility or truthfulness, several records from the Albert J. Solnit Children's Center (Solnit records) contain references to A's credibility and capacity for truthfulness. Specifically, these records contain information that was highly relevant to an assessment of whether A's description of events involving the defendant and K was truthful.[5] Our review of the available trial court record indicates that the Solnit records were never disclosed to the defendant.[6] Given that the information contained in these records was clearly material and relevant to A's credibility and her " 'ability to comprehend, know or correctly relate the truth,' " these records should have been disclosed to the parties and the court abused its discretion in failing to do so. *State* v. *McMurray*, supra, 217 Conn. 257.

We further conclude that the trial court's failure to disclose the relevant Solnit records was not harmless. In cases in which a defendant's constitutional right to confrontation is infringed, the state must prove that the trial court's decision to deny the defendant access to the sealed records was harmless beyond a reasonable doubt. See *State* v. *Slimskey*, supra, 257 Conn. 859. "Whether such error is harmless . . . depends upon a number of factors, such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." (Internal quotation marks omitted.) Id.

First, after comparing the entirety of the department records that are part of the trial court record with the sealed Solnit records, we conclude that none of the relevant impeachment material regarding A is included in the disclosed department records.[7] Consequently, the defendant did not have access to this information about A from another source.

Additionally, in the present case, the impeachment material was particularly important because there was little physical evidence that corroborated K's allegations, and A was the only witness who testified to seeing the defendant act inappropriately toward K. As a result, the prosecutor focused a significant part of her closing argument on A's testimony. She first argued that A corroborated K's testimony as to the defendant's conduct with K. She then argued that A's testimony regarding the defendant's conduct toward her proved that the defendant had the propensity or tendency "to engage in the type of criminal sexual behavior with which he is charged." She then discussed the details of A's allegations and the similarity of the actions the defendant took toward A and those he was charged with taking toward K. Ultimately, the prosecutor relied on the per-

sonal similarities between A and K, and in their testimony about the defendant's conduct, to bolster each witness' credibility and to suggest that the jury could infer the defendant's guilt. As such, the defendant's guilt, or lack thereof, turned in significant part on A's credibility. If her testimony had been discredited by the information in the Solnit records, we cannot conclude, beyond a reasonable doubt, that the jury nevertheless would have returned a guilty verdict. Further, although defense counsel was able to probe A's credibility during cross-examination, we cannot conclude that such cross-examination was adequate in light of the court's failure to disclose the Solnit records.

We acknowledge that the state relied on evidence other than A's testimony to corroborate K's testimony. For example, the contents of the defendant's phone did contain incriminating evidence that corroborated some of K's claims, including pictures of the defendant's back and back tattoos, a picture of the "V" gesture that K described, and a text message containing the words "lick, lick." That evidence, however, does not corroborate most of the acts to which K testified, including the defendant's alleged requests for her to masturbate. Furthermore, Fracasso-Kersten's testimony that Touchstone surveillance cameras captured images of the defendant moving his legs up and down the wall, as K said he did to signal her, corroborated K's testimony, but only to a limited extent. On the basis of the totality of the evidence presented at trial, we cannot conclude that the court's error in not disclosing to the parties the existence of the highly relevant Solnit records was harmless beyond a reasonable doubt. See *State* v. *Slimskey*, supra, 257 Conn. 859–60 (error in not disclosing records relevant to impeachment was not harmless despite other evidence that corroborated some aspects of victim's testimony).

Accordingly, we conclude that the court abused its discretion in keeping the relevant Solnit records under seal and not taking the steps required under *Esposito* to disclose those records to the parties. See *State* v. *Esposito*, supra, 192 Conn. 179–80. The judgment of conviction is reversed and the case is remanded for a new trial, at which the relevant Solnit records must be disclosed, contingent on A's waiver of any privilege. See *State* v. *Olah*, 60 Conn. App. 350, 355, 759 A.2d 548 (2000). If A refuses to waive the privilege, she cannot testify at a new trial. See id.

II

The defendant also claims that the court abused its discretion by allowing the state to introduce evidence of certain uncharged misconduct as propensity evidence pursuant to § 4-5 (b) of the Connecticut Code of Evidence[8] because the alleged misconduct was qualitatively different from the charged conduct. We agree.[9]

The following additional facts and procedural history are relevant to the defendant's claim. On May 28, 2019, pursuant to § 4-5 (b) of the Connecticut Code of Evidence, the state filed a notice regarding its intent to introduce at trial evidence of the defendant's other acts of sexual misconduct, specifically, evidence of the defendant's (1) misconduct toward A,[10] and (2) misconduct during his time as a police officer with the Middletown Police Department. On May 31, 2019, the defendant filed an objection, arguing that the evidence sought to be offered regarding the latter incident was too remote and dissimilar to the charged conduct for proper admission under § 4-5 (b) of the Connecticut Code of Evidence.

Thereafter, on June 4, 2019, the court held a hearing on the state's notice. The state argued that, under *State v. DeJesus*, 288 Conn. 418, 470–71, 953 A.2d 45 (2008), and § 4-5 (b) of the Connecticut Code of Evidence, evidence of the uncharged misconduct in question was sufficiently similar to the charged misconduct to be admissible. The state began by summarizing a February, 2015, incident that occurred while the defendant was employed as a Middletown police officer. During that incident, the defendant responded to an alleged violation of a protective order that had been reported by a woman, P. According to P, her sister and her sister's boyfriend were at P's house, in violation of a protective order that P had against them. After arriving at P's house, the defendant made the sister and her boyfriend leave. Then, while P had her back to the defendant, he groped her buttocks and touched her breasts. Moments later, the defendant took P's hand and placed it on his crotch. From this act, P got the impression that he was asking for oral sex. The defendant eventually left without further incident, but before he left, P gave him her phone number. A few days later, she saw him at court and he ignored her. P then reported the incident to the Middletown Police Department. At the time of the alleged assault, P was in her early twenties.

The state argued that the incident involving P was sufficiently similar to the charged conduct regarding K and, thus, that evidence of that incident was admissible at the defendant's trial. According to the state, both of the incidents were close in time, the alleged victims were both "girls who are in the prime of their sexual blossom," the conduct was similar, both young women were in vulnerable situations when targeted by the defendant, the defendant used his employment to gain access to the young women, and the defendant was in a position of authority over them.

The defendant contended that the uncharged misconduct involving P should be excluded at trial because there were significant differences between that misconduct and the conduct with which the defendant was charged. According to the defendant, evidence of the

incident involving P was too dissimilar to be admissible because P was older than K at the time of P's assault, P was in her own home when the assault allegedly occurred, the incident happened two years before the charged conduct, and the conduct in that incident was different from the defendant's conduct toward K. Furthermore, evidence of the incident involving P was more prejudicial than probative because it would lead the jury to speculate as to why the defendant left the Middletown Police Department.

The court concluded that evidence of the incident involving P was admissible at trial. The court noted that the uncharged misconduct evidence was different from what happened to K because the young women's ages and the defendant's conduct were different. The court, however, concluded that those differences were not enough to exclude the evidence because the situations that both alleged victims had found themselves in, specifically, interacting with someone in a position of authority, were sufficiently similar for the evidence to be admissible. The court also concluded that evidence of the incident was not unduly prejudicial because P could be cross-examined at trial.

At trial, P testified that, after the defendant made her sister and the boyfriend leave, he remained at her residence and the two made small talk. During that time, he noticed a marijuana bong in P's living room, joked about the bong, and told P to put it away. Then, while P was in the kitchen looking for her copy of the protective order, the defendant came up behind her and groped her breasts and buttocks. He next began wandering around P's home, eventually stopping in the bathroom. P followed him, and, while the defendant was in the bathroom, he grabbed her hand and pulled it to his crotch. When P touched his crotch, she noticed that he had an erection. P testified that she understood the defendant's action of pulling her hand to his crotch to mean that the defendant wanted her to perform oral sex on him. P rejected his advances, and the defendant eventually left.

We begin by setting forth the applicable standard of review and principles of law that guide our analysis. "The admission of evidence of prior uncharged misconduct is a decision properly within the discretion of the trial court. . . . [Every] reasonable presumption should be given in favor of the trial court's ruling. . . . [T]he trial court's decision will be reversed only where abuse of discretion is manifest or where injustice appears to have been done." (Internal quotation marks omitted.) *State* v. *Daniel W.*, 180 Conn. App. 76, 88, 182 A.3d 665, cert. denied, 328 Conn. 929, 182 A.3d 638 (2018).

As a general rule, evidence of "other crimes, wrongs or acts of a person is inadmissible to prove the bad character, propensity, or criminal tendencies of that

person." Conn. Code Evid. § 4-5 (a). In *DeJesus*, however, our Supreme Court held that evidence of uncharged sexual misconduct can be introduced as propensity evidence in criminal cases if certain conditions are met. *State* v. *DeJesus*, supra, 288 Conn. 470–71. Specifically, evidence of uncharged sexual misconduct is admissible "if it is relevant to prove that the defendant had a propensity or a tendency to engage in the type of aberrant and compulsive criminal sexual behavior with which he or she is charged. . . . [E]vidence of uncharged misconduct is relevant to prove that the defendant had a propensity or a tendency to engage in the crime charged only if it is: (1) . . . not too remote in time; (2) . . . similar to the offense charged; and (3) . . . committed upon persons similar to the prosecuting witness. . . . Second, evidence of uncharged misconduct is admissible only if its probative value outweighs the prejudicial effect that invariably flows from its admission." (Citations omitted; footnote omitted; internal quotation marks omitted.) Id., 473.

In *DeJesus*, our Supreme Court concluded that evidence of the defendant's uncharged misconduct—an incident involving a woman identified as N—was admissible to prove that the defendant had a propensity to "sexually assault young women of limited mental ability with whom he worked and over whom he had supervisory authority." Id., 474–75. This was so because of the similarities between the two assaults: "The women were similar in age and appearance. Both suffered from a mental disability and had a difficult time learning new skills. The defendant had hired both the victim and N and was aware of their mental limitations. The defendant's assaults of the two women occurred in a similar manner as well." (Internal quotation marks omitted.) Id., 475.

In contrast, in *State* v. *Ellis*, 270 Conn. 337, 358, 852 A.2d 676 (2004), our Supreme Court held that certain uncharged misconduct evidence was too dissimilar from the charged crime to be admissible.[11] In *Ellis*, the defendant was charged with sexual misconduct toward a teenager, Sarah S. Id., 352. During the trial, the prosecution, over the defendant's objections, introduced the testimony of three other victims to help establish a common plan or scheme on the part of the defendant.[12] Id. On appeal, the defendant argued that this evidence was erroneously admitted because the incidents involving Sarah S. differed in frequency and severity from those involving the other girls, and the defendant had a different relationship with Sarah S. than he had with the other girls. Id. Our Supreme Court agreed and concluded that the trial court erred in admitting the testimony of the other girls because (1) Sarah S. had been assaulted at least eight times, while the others were assaulted only once or twice, (2) the defendant's abuse of Sarah S. was far more extreme than his abuse of the other girls, and (3) the other girls had a relationship

with the defendant and had frequent and continuous contact with him while Sarah S. did not. Id., 358–61. On the basis of these differences, our Supreme Court held that the evidence concerning the other girls was too dissimilar to the charged conduct to be admissible. Id., 365; see also *State* v. *Gupta*, 297 Conn. 211, 229, 998 A.2d 1085 (2010) (victims in one case were too dissimilar to support cross admissibility in separate case because defendant's conduct toward one victim was more frequent and severe than his conduct toward others), overruled on other grounds by *State* v. *Payne*, 303 Conn. 538, 34 A.3d 370 (2012).

In applying *DeJesus* and *Ellis*, our appellate courts consistently have considered several factors to determine whether evidence of uncharged misconduct is sufficiently similar to the charged conduct to be admissible. Those factors include the location of the assaults, the defendant's conduct, the relationship between the defendant and the victims, the ages of the victims, and the frequency and severity of the assaults. See, e.g., *State* v. *Acosta*, 326 Conn. 405, 416–18, 164 A.3d 672 (2017) (uncharged misconduct evidence admissible where defendant's conduct was similar, victims were similar in age, and victims were both nieces of defendant); *State* v. *Gupta*, supra, 297 Conn. 229 (considering frequency and severity of defendant's assaults on different victims in determining admissibility of uncharged misconduct evidence); *State* v. *Angel M.*, 180 Conn. App. 250, 261–62, 183 A.3d 636 (2018) (uncharged misconduct evidence was admissible where assaults occurred in same location, charged and uncharged conduct was identical, victims were same age, and defendant was "parental figure" to both victims), aff'd, 337 Conn. 655, 255 A.3d 801 (2020); *State* v. *Daniel W.*, supra, 180 Conn. App. 85–86 (uncharged misconduct evidence was admissible where assaults occurred in same location, assaults began while both victims were asleep, victims were both young girls, and charged and uncharged conduct was identical).

After considering the applicability of these factors to the present case, we conclude that the defendant's uncharged misconduct toward P was not sufficiently similar to the charged conduct involving K to be admissible at trial. First, both the frequency and severity of the assaults were different. With K, the defendant's conduct occurred repeatedly over a period of two months. Further, according to K's testimony, throughout that time, the defendant (1) groped her buttocks, (2) made explicit references to wanting her to perform oral sex on him, (3) had her masturbate in front of him at least ten times, (4) used a series of signals to tell her how he wanted her to masturbate, (5) ran his hand up her inner thigh, almost to the point of vaginal penetration, (6) had her wipe her vaginal fluid on his hand, and (7) showed her sexually inappropriate notes and pictures on his phone. In contrast, the defendant's

alleged assault of P was a one time, relatively brief encounter, and his conduct was limited to (1) groping her buttocks and breasts, (2) pulling her hand to his crotch, and (3) insinuating that he wanted her to perform oral sex on him.

The state contends that the defendant's assault of P was less frequent and less severe than his assault of K only because the defendant had just one interaction with P. We are not persuaded. The defendant had P's phone number and knew where she lived. The defendant also saw P at court on at least one occasion. Yet, despite this, he never made a second attempt to assault her. In fact, he chose to ignore her.

Moreover, although the defendant was in a position of authority over both young women, the position of authority that he held in each incident was materially different. As a Touchstone employee, the defendant was responsible for providing K with trauma informed care and for teaching her important life skills. As such, the defendant had significant control over most aspects of her daily life. K also was confined to Touchstone and could not escape the defendant's presence nor tell him to leave the facility. In contrast, the defendant had little control over P. At the time of the alleged assault, P was neither under arrest nor a suspect in a crime. Moreover, given that the incident occurred in P's home, she was not precluded from asking the defendant to leave or leaving herself. The state argues that the defendant did have control over P because he could have arrested her for possessing drug paraphernalia. P testified, however, that the defendant instructed her to put away the bong before he assaulted her. Furthermore, P did not testify that the defendant threatened to arrest her if she did not accede to his assaultive conduct or that she ever felt at risk of being arrested. Consequently, to the extent that the defendant had any control over P, it was minimal as compared to the pervasive control that he exercised over K.

The locations of the assaults also were materially different. The defendant's alleged assault of P occurred when she was alone and in her home with the defendant, while the defendant's assault of K occurred when she was in a group facility where there was a risk of detection. Moreover, the defendant had a relationship with K while P was a total stranger to him. The young women were also different ages at the time of the alleged assaults, as P was in her early twenties and K was fifteen. But see *State* v. *Johnson*, 76 Conn. App. 410, 419, 819 A.2d 871 (victims were sufficiently similar even though three were adult women and one was teen), cert. denied, 264 Conn. 912, 826 A.2d 1156 (2003).

The state is correct that the uncharged misconduct evidence was not too remote in time to be admissible because the charged conduct occurred just two years after the incident involving P. See id. (three year gap

between uncharged and charged incidents was sufficiently proximate). We also agree with the state that there are some similarities between the charged and uncharged misconduct, namely, that (1) both K and P were in vulnerable situations when the assaults occurred, (2) the defendant used his employment to gain access to both young women, and (3) in both incidents, the defendant allegedly groped the young women's buttocks and hinted at them performing oral sex on him. These few similarities, however, provide an insufficient basis upon which to conclude that evidence of the incident involving P was admissible, given the many significant differences between the charged conduct and the uncharged conduct. Thus, we conclude that evidence of that incident was too dissimilar from the charged conduct to be admissible at the defendant's trial and that the trial court erred in admitting that evidence.[13]

The judgment is reversed and the case is remanded for a new trial.

In this opinion the other judges concurred.

[1] In accordance with our policy of protecting the privacy interests of the victims of sexual assault and the crime of risk of injury to a child, we decline to identify the victim or others through whom the victim's identity might be ascertained. See General Statutes § 54-86e.

[2] We decline to review the defendant's third claim because he makes a different argument on appeal than was made at trial, thus rendering the claim unpreserved. Specifically, on appeal, the defendant contends that evidence of K's sexual history should have been admissible for credibility purposes. This differs from the argument made before the trial court, which was that K's sexual history was admissible under *State* v. *Rolon*, 257 Conn. 156, 777 A.2d 604 (2001), to demonstrate an alternative source of information for her sexual knowledge. As such, we are not required to review this claim. See *State* v. *Scott C.*, 120 Conn. App. 26, 34, 990 A.2d 1252 (declining to review claim based on grounds different from those raised before trial court), cert. denied, 297 Conn. 913, 995 A.2d 956 (2010).

Moreover, the record is unclear as to whether the court explicitly barred the introduction of evidence concerning alleged conduct that could be viewed as distinct from K's prior sexual history. Given this, we further decline to review the defendant's third claim because it is unclear, based on the record, if or how that issue might arise on remand.

[3] For the sake of clarity and ease of discussion, we have reordered the claims as they are set forth in the defendant's brief.

[4] Nothing in the record identifies which department documents were released to the parties. It appears from the parties' briefs that at least two different department records were, at some point, released to the defendant. Those records, however, are also not included in the record on appeal.

[5] We decline to divulge specific information or any details about what our in camera review revealed because A might decide to preclude the disclosure of the relevant records. See *State* v. *Olah*, 60 Conn. App. 350, 355, 759 A.2d 548 (2000) ("The state must obtain the witness' consent to waive his or her privilege so that the relevant portion of the record may be released to the defendant. If such waiver is not forthcoming, the witness' testimony must be stricken.").

[6] Although the record of what documents were released to the parties is not entirely clear, according to the parties' briefs and the trial transcripts, it appears that the only records that were disclosed were records from the department, which were subpoenaed by the state and did not include the Solnit records in question that were subpoenaed by the defendant.

[7] Because the record does not reflect what department records were disclosed to the parties, we have reviewed the entirety of the department records that are part of the trial court record, and none of them includes the information that is in the sealed Solnit records.

[8] Section 4-5 (b) of the Connecticut Code of Evidence provides: "Evidence

of other sexual misconduct is admissible in a criminal case to establish that the defendant had a tendency or a propensity to engage in aberrant and compulsive sexual misconduct if: (1) the case involves aberrant and compulsive sexual misconduct; (2) the trial court finds that the evidence is relevant to a charged offense in that the other sexual misconduct is not too remote in time, was allegedly committed upon a person similar to the alleged victim, and was otherwise similar in nature and circumstances to the aberrant and compulsive sexual misconduct at issue in the case; and (3) the trial court finds that the probative value of the evidence outweighs its prejudicial effect."

[9] On appeal, the defendant also argues that the trial court erred in admitting evidence of uncharged misconduct because the court never made a finding that his conduct was both aberrant *and* compulsive, as required by § 4-5 (b) of the Connecticut Code of Evidence. We decline to address this argument, however, because, as defense counsel conceded at oral argument before this court, it was not raised before the trial court. Instead, the only issue raised before the trial court as to uncharged misconduct under § 4-5 (b) was whether the uncharged misconduct was similar enough to the charged conduct to be admissible. The defendant never challenged whether or not the uncharged misconduct was aberrant and compulsive in nature. As such, we will not consider this claim. See Practice Book § 60-5 ("[t]he court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial"). We also decline to address this argument because it is not likely to arise during the proceedings on remand.

[10] On appeal, the defendant does not challenge the admissibility of the uncharged misconduct evidence concerning A.

[11] We acknowledge that *Ellis* predates *DeJesus* and also involves the admissibility of prior misconduct evidence to show a common plan or scheme and not, as in *DeJesus*, to demonstrate that the defendant had a propensity to commit sexual assault. *State* v. *Ellis*, supra, 270 Conn. 352. Nevertheless, in *State* v. *Gupta*, 297 Conn. 211, 225 n.7, 998 A.2d 1085 (2010), overruled on other grounds by *State* v. *Payne*, 303 Conn. 538, 34 A.3d 370 (2012), our Supreme Court made clear that, although in *DeJesus* it "changed the label of the exception" from the common plan or scheme exception to the propensity exception, it "did not change the parameters that such evidence must satisfy to be admissible. . . . Therefore, *DeJesus* in no way undermines the vitality of the reasoning in *Ellis*." (Citations omitted.) Consequently, both this court and our Supreme Court still consider the factors set out in *Ellis* when analyzing the admissibility of uncharged misconduct evidence pursuant to *DeJesus*. See, e.g., *State* v. *Devon D.*, 321 Conn. 656, 671, 138 A.3d 849 (2016); *State* v. *Eddie N. C.*, 178 Conn. App. 147, 163, 174 A.3d 803 (2017), cert. denied, 327 Conn. 1000, 176 A.3d 558 (2018). Thus, the factors set forth in *Ellis* are relevant to our analysis in the present case.

[12] In *Ellis*, the defendant also was charged with sexual misconduct as to two of the other three witnesses whose testimony the state relied on in Sarah S.'s case, and the three cases were consolidated for trial. *State* v. *Ellis*, supra, 270 Conn. 365. Consistent with its conclusion that the court erred in allowing the testimony of the other three witnesses to be used in Sarah S.'s case, our Supreme Court also held that the trial court erred in consolidating Sarah S.'s case with the other two cases. Id., 381.

[13] We note that the state contends that any error in this regard was harmless. Because we address this claim as an issue likely to arise on remand, we need not address questions of harmless error in the present appeal. See *State* v. *Ashby*, 336 Conn. 452, 496 n.43, 247 A.3d 521 (2020). Nevertheless, we do note that, in arguing that any error in admitting P's testimony was harmless, the state relies, in part, on A's testimony corroborating K's allegations and A's testimony that the defendant "similarly asked her to masturbate for him." This reliance buttresses our conclusion in part I of this opinion that the failure to disclose relevant impeachment material regarding A was not harmless.